GREAT LAKES DREDGE & DOCK COMPANY, Plaintiff–Appellant,

v.

CITY OF CHICAGO, an Illinois municipal corporation, Defendant–Appellee,

and

Jerome B. Grubart, Inc., an Illinois Corporation, Claimant–Appellee.

No. 93–1421.

United States Court of Appeals, Seventh Circuit.

Argued April 26, 1993.

Decided August 24, 1993.

Rehearing and Suggestion for Rehearing En Banc Denied Oct. 7, 1993.*

* Honorable Ilana Diamond Rovner, Circuit Judge, did not participate in consideration of this petition for rehearing en banc.

Duane M. Kelley, Jack J. Crowe, Winston & Strawn, Paul Kozacky, Jeffrey E. Stone, Douglas M. Reimer (argued), William P. Schuman, John T. Schriver, Stewart W. Karge, McDermott, Will & Emery, Chicago, for plaintiff-appellant Great Lakes Dredge & Dock Co.

Barry Sullivan (argued), Theodore Tetzlaff, Russ M. Strobel, Richard C. Bollow, Jeffrey T. Shaw, Jenner & Block, Alan W. Brothers, Hubert O. Thompson, Lori A. Owens, Carney & Brothers, Kelly R. Welsh, Asst. Corp. Counsel, Office of Corp. Counsel, Appeals Div., Chicago, for defendant-appellee City of Chicago.

William J. Harte, and Robert A. Holstein, Aron D. Robinson, Bruce J. Goodhart, Holstein, Mack & Klein, Ben Barnow (argued), Barnow & Hefty, Chicago, for appellee Jerome B. Grubart.

Warren J. Marwedel, Dennis Minichello, Shari L. Friedman, Robert A. Roth, Robert L. Reeb, Keck, Mahin & Cate, Chicago, IL, George W. Healy, III, Maritime Law Ass'n, New Orleans, LA, for amicus curiae Maritime Law Ass'n of U.S.

Before CUDAHY and EASTERBROOK, Circuit Judges, and EISELE, Senior District Judge.**

CUDAHY, Circuit Judge.

On April 13, 1992, the Chicago River "sprung a leak." Mike Royko, *Putting in a Plug for the City that Leaks,* Chi. Trib., Apr. 14, 1992, at 3. On that date, a breach occurred in the roof of a freight tunnel running beneath the river. Water rapidly filled that tunnel and spread to the web of tunnels located throughout the city's downtown area. A number of buildings connected to this tunnel system were flooded and seriously damaged. Business in Chicago's downtown district was disrupted for many days as was

maritime traffic on the portion of the river near the rupture in the tunnel wall.[1] Shortly after the leak was plugged, thousands of plaintiffs, including individuals, businesses and the City of Chicago (the City), filed suit in the Cook County Circuit Court against Great Lakes Dredge & Dock Company (Great Lakes), a contractor hired by the City to replace pile clusters (known in the trade as "dolphins") at five bridge sites along the Chicago River.[2] These claimants, for the most part, allege that Great Lakes negligently installed dolphins in the vicinity of the Kinzie Street Bridge and, as a result, caused the breach in the tunnel which, in turn, caused the flood.

On October 6, 1992, Great Lakes filed a three-count complaint in the district court, claiming the existence of federal admiralty jurisdiction. Count I demands exoneration from or limitation of liability pursuant to the Limitation of Vessel Owner's Liability Act, 46 U.S.C.App. §§ 181–96 (the Limitation Act). In Counts II and III, Great Lakes requests indemnity or contribution from the City for any damages that Great Lakes may be adjudged liable to pay.[3] Great Lakes contends that the City alone was responsible for the flood either because it failed to disclose to Great Lakes the existence of the tunnel near the Kinzie Street Bridge or because it failed to adequately repair and maintain the tunnel. Jerome B. Grubart, Inc. (Grubart), a downtown business which allegedly suffered damage as a result of the flood, filed a claim in the federal proceeding. The City and Grubart moved the district court to dismiss Great Lakes' complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction or, in the alternative, pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted. The district court granted these

---

** Hon. Garnett Thomas Eisele, of the United States District Court for the Eastern District of Arkansas, is sitting by designation.

1. To assist repair, the Captain of the Port of Chicago ordered the river closed, for more than a month, between Grand Avenue on the North Branch, Cermak Road on the South Branch and Lake Michigan on the Main Branch.

2. These lawsuits have been (and continue to be) assigned to a single judge and consolidated under the caption *In re Chicago Flood Litigation,* No. 92 L 5422.

3. Counts II and III were added by way of impleader pursuant to Fed.R.Civ.P. 14(a) & (c).

motions. Great Lakes appeals, and we, considering the matter *de novo*, now reverse.

Article III, section two of the United States Constitution provides that "the judicial power shall extend . . . to all Cases of admiralty and maritime Jurisdiction," and 28 U.S.C. § 1333(1) places such power exclusively within the jurisdiction of the United States district courts. Our first task is to determine whether the tort at the heart of this litigation, Great Lakes' alleged negligence, is within the admiralty jurisdiction. We conclude that it is.

Before the last twenty years, admiralty jurisdiction over torts turned on the satisfaction of a so-called "locality" (or "situs") test. Under this test, "every species of tort, however occurring, and whether on board a vessel or not, if upon the high seas or navigable waters, is of admiralty cognizance." *The Plymouth,* 70 U.S. (3 Wall.) 20, 36 18 L.Ed. 125 (1865). This principle, however, never took the form of a holding of the Supreme Court, and, as early as 1850 the author of a noted treatise on admiralty law expressed doubt that admiralty jurisdiction depended solely on a maritime location. He suggested that admiralty jurisdiction existed, in tort cases, only if the tort bore some relationship to navigation or maritime commerce. *See* Erastus C. Benedict, The Law of American Admiralty 173 (1850). The Supreme Court, however, did not squarely address this issue until 1972. Nonetheless, generations of admiralty practitioners and students believed that the locality test alone was controlling.

In *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), an aircraft crashed into the navigable waters of Lake Erie after striking a flock of sea gulls while taking off. The Court held that there was no admiralty jurisdiction, despite the existence of a maritime situs, because "the wrong [did not] bear a significant relationship to traditional maritime activity." *Id.* at 268, 93 S.Ct. at 504. Although the Court explicitly limited the application of this new "nexus" requirement to cases involving aviation torts, some courts applied it more broadly. *See, e.g., Kelly v. Smith,* 485 F.2d 520 (5th Cir.1973), *cert. de-*

*nied,* 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974).

Ten years after *Executive Jet,* the Supreme Court first said, although technically in dictum, that the "nexus" requirement was not moored to aviation disasters. In *Foremost Insurance Co. v. Richardson,* 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982), a case involving the collision of two pleasure boats in navigable waters, the Court expanded its holding in *Executive Jet* in two ways. First, the "requirement that the wrong have a significant connection with traditional maritime activity" was incorporated into all assertions of maritime tort jurisdiction. *Id.* at 674, 102 S.Ct. at 2658. Second, the Court concluded that "traditional maritime activity" was not limited to *commercial* maritime activity. *Id.* The Court found that the "federal interest in protecting maritime commerce cannot be adequately served if admiralty jurisdiction is restricted to those individuals actually *engaged* in commercial maritime activity." *Id.* at 674–75, 102 S.Ct. at 2658. It was enough, therefore, for purposes of sustaining admiralty jurisdiction, that the collision in *Foremost* had a "potentially disruptive impact" on maritime commerce. *Id.* at 675, 102 S.Ct. at 2658.

■ After *Foremost,* many courts, prominently including this one, grappled with the precise meaning of the "nexus" requirement. The Supreme Court provided additional guidance in *Sisson v. Ruby,* 497 U.S. 358, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990), *rev'g Complaint of Sisson,* 867 F.2d 341 (7th Cir.1989) (Cudahy, J.). In *Sisson,* a fire erupted in the washer/dryer unit of a large pleasure yacht docked at a recreational marina on Lake Michigan, a navigable waterway. The fire spread to other recreational vessels and the marina itself. No commercial vessels were damaged since none were docked at the marina at the time of the fire (nor were any ever likely to be docked there). In reversing this Circuit to find admiralty jurisdiction, the Court bifurcated its analysis of the "nexus" requirement. The Court began by assessing the relationship between admiralty jurisdiction and the disruption of maritime commerce. The Court stated that the jurisdictional inquiry does not require an as-

sessment of the incident's actual effects on maritime commerce. Rather, admiralty jurisdiction can exist if an incident creates a *"potential* hazard to maritime commerce," even though maritime commerce is in no way disturbed. *Id.* at 362, 110 S.Ct. at 2895 (quoting *Foremost,* 457 U.S. at 675 n. 5, 102 S.Ct. at 2658 n. 5 (emphasis supplied)). Moreover, in determining the existence of such a "potential hazard," a court does not consider the particular facts of the case before it, but "must assess the general features of the type of incident involved to determine whether such an incident is likely to disrupt commercial activity." *Id.* at 363, 110 S.Ct. at 2896. The Court concluded that the fire in *Sisson* "plainly satisf[ied]" this requirement, presumably because it could have damaged commercial vessels, had any been docked at the recreational marina at the time, or because the damage to the marina itself might have disturbed commercial maritime traffic.[4] *Id.* This seemingly rather remote possibility of impact on maritime traffic appeared to be enough to support admiralty jurisdiction.

The Court also reiterated its holding in *Foremost* that admiralty jurisdiction does not exist, notwithstanding an incident's potential impact on maritime commerce, unless there is "a substantial relationship between the activity giving rise to the incident and traditional maritime activity." *Id.* at 364, 110 S.Ct. at 2897. The Court stressed that the relevant activity is "defined not by the particular circumstances of the incident, but by the general conduct from which the incident arose." *Id.* Accordingly, the Court characterized the relevant conduct in *Sisson* as "storage and maintenance of a boat at a marina on navigable waters." *Id.* at 365, 110 S.Ct. at 2897. Since this is a "common, if not indispensable, maritime activity," the Court concluded that admiralty jurisdiction did exist. *Id.* at 367, 110 S.Ct. at 2898.

After *Sisson,* in ascertaining the existence of admiralty jurisdiction we ask three questions about the incident giving rise to the alleged wrong: (1) did it occur on the navigable waters of the United States? (2) did it pose a potential hazard to maritime commerce? and (3) was it substantially related to traditional maritime activity? If all three questions are answered in the affirmative, a claim arising out of the incident falls within the admiralty jurisdiction. The district court, although clearly cognizant of the *Executive Jet, Foremost* and *Sisson* trilogy, used a "totality of the circumstances" test, first articulated by the Fifth Circuit seventeen. years before *Sisson* was decided, in assessing the existence of admiralty jurisdiction. *Great Lakes Dredge & Dock Co. v. City of Chicago,* No. 92 C 6754, slip op. at 14, (N.D.Ill. Feb. 18, 1993) (hereinafter Mem.Op. & Ord.) (citing *Kelly v. Smith,* 485 F.2d 520, 525 (5th Cir.1973)). The court also stated,

> Federal admiralty jurisdiction will be sustained only if a case presents the need to protect maritime commerce through adherence to a uniform and specialized set of rules such as those involving navigation and seaworthiness. There is no compelling reason to adjudicate the host of issues raised by the pleadings under this specialized set of rules.

Mem.Op. & Ord. at 20. We believe that, following *Sisson,* the jurisdictional inquiry must be much more rigidly structured than this. A court may not engage in the sort of policy analysis that apparently informed the district court's decision. Similar policy analysis would likely have yielded a different result in *Sisson* itself. *See, e.g.,* D.T. Plunkett, Sisson v. Ruby, *Muddying the Waters of Admiralty Jurisdiction,* 65 Tul.L.Rev. 697 (1991); Phyllis D. Carnilla & Michael P. Drzal, Foremost Insurance Co. v. Richardson: *If This is Water, It Must be Admiralty,*

---

**4.** Alternatively, perhaps the Court concluded that aquatic recreation *is* commerce. No one who has been to Disney World can doubt that recreation is big business. Seventy years ago, the Supreme Court reasoned that baseball, being a recreation, is not commerce and therefore is exempt from the federal antitrust laws. *Federal Baseball Club v. National League of Professional Baseball Clubs,* 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898 (1922). Although the Court has never

disturbed baseball's antitrust exemption, it has, in recent years, acknowledged that "baseball is a business and it is engaged in interstate commerce." *Flood v. Kuhn,* 407 U.S. 258, 282, 92 S.Ct. 2099, 2112, 32 L.Ed.2d 728 (1972). We can, therefore, speculate that the fire in *Sisson* was a potential hazard to maritime commerce because it, or more accurately, fires on pleasure boats generally, are likely to disrupt recreational activities on the water.

59 Wash.L.Rev. 1 (1983). A court, therefore, may only ask the three questions posed above, which we now consider seriatim.

Turning first to the "locality" requirement, we note that a tort occurs on navigable waters when its " 'substance and consummation' take place there," even though the allegedly negligent act itself occurred on land. 1 Benedict on Admiralty § 172 at 11–32 (7th ed. 1991) (quoting *The Plymouth*, 70 U.S. (3 Wall.) 20 (1865)). There can be no doubt that the Chicago River, and all of its branches, is a navigable waterway of the United States. *See Escanaba Co. v. City of Chicago*, 107 U.S. 678, 683, 2 S.Ct. 185, 188–89, 27 L.Ed. 442 (1883). Nor is there any dispute that Great Lakes' vessels were located in the navigable "channel" of the Chicago River while engaged in the removal and replacement of the pile clusters. Hence, it follows that the alleged tort—the negligent driving of pilings into the riverbed—occurred on a navigable waterway. It is of no consequence that the piling clusters were located outside of the navigable "channel," since the navigable waterway extends from shore to shore. *See Greenleaf Johnson Lumber Co. v. Garrison*, 237 U.S. 251, 263, 35 S.Ct. 551, 555, 59 L.Ed. 939 (1915).

The City and Grubart make much of the fact that most of the damage in this case occurred on land far from the river. But the Admiralty Extension Act provides that the admiralty jurisdiction "shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land." 46 U.S.C.App. § 740. The City and Grubart dispute the applicability of this provision on two grounds. First, they suggest that the barges from which Great Lakes operated are not "vessels" because they were, at that time, being used as stationary platforms. We have stated, however, that a craft is a "vessel" if its purpose is to some

reasonable degree "the transportation of passengers, cargo, or equipment from place to place across navigable waters." *Johnson v. John F. Beasley Construction Co.*, 742 F.2d 1054, 1063 (7th Cir.1984), *cert. denied*, 469 U.S. 1211, 105 S.Ct. 1180, 84 L.Ed.2d 328 (1985). There is no doubt that Great Lakes' barges are capable of, and have performed, such transportation functions. Accordingly, they are "vessels." Second, the City suggests that 46 U.S.C.App. § 740 is inapplicable because the damage to the downtown businesses was felt at a time and place too "remote from the wrongful act." *Gutierrez v. Waterman S.S. Corp.*, 373 U.S. 206, 210, 83 S.Ct. 1185, 1188, 10 L.Ed.2d 297 (1963). We must reject these contentions. We believe that the requirement of temporal proximity is nothing more than a specialized rule of proximate causation. And we do not believe that the elapse of six months, the period of time between Great Lakes' completion of its work and the flood, bars application of the Admiralty Extension Act.

*Gutierrez* itself illustrates why the Admiralty Extension Act comprehends the damage asserted in this case notwithstanding the fact that it was felt some distance from the river. In *Gutierrez*, a cargo of beans was packed aboard a ship in broken and defective bags. While the beans were being unloaded, some spilled out of the bags onto the surface of the pier. A longshoreman slipped on some of these loose beans and was injured. Applying 46 U.S.C.App. § 740, the Court found the existence of admiralty jurisdiction. A similar result is indicated in the present case. Here water, like the beans, spilled into the freight tunnel through a breach allegedly caused by Great Lakes' negligence. We will not allow the fortuitous existence of an elaborate tunnel system, which simply transported the moving water away from the original breach and spread the damage, to defeat jurisdiction.[5] In sum, therefore, the incident satisfies the "locality" requirement.

---

**5.** Grubart argues that there is no jurisdiction here because, even if Great Lakes' activities were traditionally maritime, the injured parties were not engaged in maritime activity. Grubart's Br. at 32–37. Grubart points to language the Supreme Court used in a footnote in *Sisson:* "Different issues may be raised in a case in which

one of the instrumentalities is engaged in a traditional maritime activity, but the other is not. Our resolution of such issues awaits a case that squarely addresses them." 497 U.S. at 365 n. 3, 110 S.Ct. at 2897 n. 3. Grubart suggests that this is such a case. If we were to adopt such a view in this case, however, we would render the

Our next inquiry is whether the incident posed a potential hazard to maritime commerce. We are led to ask: Did the installation of pilings from barges located in the navigable channel of the Chicago River create a potential to disrupt commercial maritime activity?[6] This is not a case, like *Foremost* or *Sisson*, in which we must imagine the various ways in which the installation of pilings might disrupt travel on the river. Because commerce on the river was *actually* disrupted for more than a month, this question answers itself. Yes, there was such a potential. In fact, it was realized.[7]

Finally, we must determine if the activity in which Great Lakes was engaged is substantially related to traditional maritime activity. Great Lakes' activity at the time it allegedly caused, or precipitated, the flood may be described, in the most general terms, as the sinking of pilings into a riverbed. The parties make strenuous efforts to establish the purpose served by the particular dolphins that Great Lakes was hired to install. The City and Grubart contend that they were intended exclusively to protect the nearby bridges. Great Lakes concedes that this was one of their purposes but maintains that they were also designed to protect ships that collide with the bridges and to serve as navigation aids. But we need not resolve this debate, because we are concerned only with "the general character of the activity." *Sisson*, 497 U.S. at 365, 110 S.Ct. at 2897. There is no dispute that dolphins are capable

of, and *generally* do, serve all of the purposes mentioned, two of which, protecting ships from collisions with bridges and aiding navigation, are unquestionably related to maritime activity. It follows logically that the installation of dolphins relates to maritime activity.

Having found that the incident giving rise to the damage of which the City and Grubart complains satisfies all of the prerequisites of admiralty jurisdiction identified in *Sisson*, we conclude that the district court erred in dismissing this case for lack of subject matter jurisdiction.[8] Great Lakes' complaint must still fall though if it fails to state a basis for recovery. Accordingly, we direct our attention now to the Limitation Act, the substantive law upon which Great Lakes anchors its claim.

 The Limitation Act provides that the liability of a shipowner for any loss or damage "done, occasioned, or incurred without the privity or knowledge of such owner ... shall not ... exceed the ... value of the interest of such owner in [the] vessel." 46 U.S.C.App. § 183(a). Great Lakes' complaint is proper as to form and will, therefore, survive a Rule 12(b)(6) motion unless Great Lakes is not entitled to relief "under any set of facts that could be proved consistent with the allegations." *Dawson v. General Motors Corp.*, 977 F.2d 369, 372 (7th Cir. 1992). The district court concluded that Great Lakes is clothed with "privity and

Admiralty Extension Act meaningless. That act seems explicitly to address situations, like this one, where the injury-causing activity occurs on a vessel on a navigable waterway but the injury itself is felt on land.

6. This is not the first case in which tunnels under the Chicago River have been the subject of litigation. In *West Chicago St. R.R. Co. v. Illinois ex rel. Chicago*, 201 U.S. 506, 521, 26 S.Ct. 518, 521, 50 L.Ed. 845 (1906), for example, one such tunnel was itself found to be "an obstruction to free navigation on the river."

7. The City reads *Sisson* to preclude any reliance on what really happened, citing the Court's language that the actual effects on maritime commerce are irrelevant. City's Br. at 30. But when *Sisson* and *Foremost* are considered in context, the fallaciousness of the City's argument becomes apparent. Maritime commerce was not disturbed by the incidents in *Sisson* or *Foremost*. Hence, the Court was forced to engage in a

counter-factual analysis: Were the general features of the incidents in those cases likely to disrupt commercial activity? Here we need not engage in any such inquiry, since we know to an absolute certainty that Great Lakes' activity, and the incident it engendered, had the potential to disrupt maritime commerce. Moreover, we are not convinced by the City's argument that pile installation is generally more likely to damage adjacent structures than to interfere with maritime commerce. It seems no more likely that a crane or pile driver or some other piece of equipment used to remove and install pilings would fall toward the shore than out across the river.

8. Because we conclude that 28 U.S.C. § 1333(1) adequately supports the district court's jurisdiction, we do not address Great Lakes' contention that the Limitation Act is an independent source of subject matter jurisdiction.

knowledge" and thus is not entitled to the benefit of the Limitation Act. Consistent with this conclusion, the district court dismissed the complaint for failure to state a claim upon which relief could be granted.[9] Great Lakes does not dispute the district court's assertion that it bears the "ultimate burden of proving lack of privity or knowledge." Mem.Op. & Ord. at 27 (citing *In re Oil Spill by the Amoco Cadiz,* 954 F.2d 1279, 1305 (7th Cir.1992)). Rather, Great Lakes argues that the district court impermissibly short-circuited the proceeding by dismissing its complaint on the pleadings.

■ The Limitation Act does not define the phrase "privity or knowledge," but its central meaning has been clear for at least fifty years. The Limitation Act is intended to shield from liability, beyond the amount of their interest in a vessel, "innocent shipowners and investors who were sued for damages caused through no fault or neglect of their own." *American Car & Foundry Co. v. Brassert,* 289 U.S. 261, 264, 53 S.Ct. 618, 619, 77 L.Ed. 1162 (1933). "Privity or knowledge," the absence of which is the touchstone of innocence according to the statute, is understood to be an owner's "personal participation ... in the fault or negligence which caused or contributed to the loss or injury." *Coryell v. Phipps,* 317 U.S. 406, 411, 63 S.Ct. 291, 293, 87 L.Ed. 363 (1943). What acts constitute "personal participation" is a troubling question in and of itself. *See Joyce v. Joyce,* 975 F.2d 379, 384 (7th Cir.1992) (collecting cases). But when the shipowner seeking limitation of liability is a corporation, such as here, an equally puzzling antecedent question is raised: Whose participation is attributable to the corporation?

For purposes of determining a corporate shipowner's "privity or knowledge," we may divide its employees into two groups. One consists of corporate managers vested with discretionary authority. The other contains ministerial agents or employees. 3 Benedict on Admiralty § 42 at 5–14 (7th rev. ed. 1991). If a managerial employee is possessed of "privity or knowledge," i.e., if he or she personally participates in the activity that caused the alleged loss, the corporation is precluded from the benefit of the Limitation Act. *Id.* On the other hand, the privity or knowledge of purely ministerial employees is not attributable to the corporation. *Id.* Great Lakes is alleged to have negligently installed the pile clusters near the Kinzie Street Bridge. Such negligence presumably could be the result of any number of actions taken by any number of corporate employees. For example, Great Lakes may have unreasonably failed to ascertain the existence of the freight tunnel beneath the river. Or, with full knowledge of the tunnel's existence, Great Lakes may have driven the pilings into the riverbed in a manner that unreasonably jeopardized the tunnel's integrity. The record is absolutely silent as to which corporate employees performed which tasks. We cannot determine, therefore, whether Great Lakes' negligence, if any, was, on the one hand, the product of unreasonable activity engaged in by one of its managerial employees or, on the other hand, the result of negligence or misconduct of one of its laborers at the job site. Because Great Lakes' ability to invoke the Limitation Act rests upon these precise determinations, the district court erred in dismissing the complaint.[10]

The district court relied upon our decision in *Joyce v. Joyce,* 975 F.2d 379 (7th Cir.1992), in concluding that Great Lakes' ability to invoke the Limitation Act "will have no effect on [its] potential liability." Mem.Op. & Ord. at 28. In *Joyce,* the plaintiff charged that she was injured because a shipowner negli-

---

9. We agree with the district court that both components of count I of Great Lakes' complaint, which seeks limitation of and exoneration from liability, rise or fall together, *see Wheeler v. Marine Navigation Sulphur Carriers, Inc.,* 764 F.2d 1008, 1011 (4th Cir.1985) ("[O]nce limitation is denied, [claimants] should be permitted to elect whether to remain in the limitation proceeding or to revive their original claims in their original fora."), and that subject matter jurisdiction over counts II and III hinges upon the vitality of count I.

10. On remand, the district court, after adequate discovery, may have to decide whether certain activity was performed by "managerial" or "ministerial" employees. In this regard, we refer the district court to *In re Oil Spill by the Amoco Cadiz,* 954 F.2d 1279, 1303–04 (7th Cir.1992).

232

gently entrusted his vessel to a person he knew, or should have known, was likely to use it in a manner involving an unreasonable risk of harm. The shipowner, an individual, sought to limit his liability pursuant to the Limitation Act. We concluded that the Limitation Act afforded the shipowner no protection because, if he did entrust the boat as alleged, he was not only negligent "but also had either knowledge or constructive knowledge sufficient to place him beyond the protection of the [Limitation Act]." *Id.* at 385. We further noted that if the owner did not negligently entrust his boat to someone he knew was unable to use it safely, he was not liable and thus had no need for the Limitation Act's protection. *Id.* Because the shipowner in *Joyce* was an individual, i.e., a natural person, our holding in that case is not appropriate to guide our decision here. The present case, which involves a corporate shipowner, lacks the same confluence of negligence and knowledge as existed in *Joyce.* Great Lakes is vicariously liable for the negligence of all of its employees. But it will be charged, for purposes of the Limitation Act, with the privity and knowledge only of certain managerial employees.

The district court also concluded that the "personal contracts doctrine" prevents Great Lakes from invoking the Limitation Act. Mem.Op. & Ord. at 30. This doctrine, except as we discuss below, may be inapplicable here and, in any event, is not a proper basis for dismissal on the pleadings. The liability Great Lakes seeks to limit arises primarily from claims sounding in tort, i.e., the claims of businesses, such as Grubart, that were in some way harmed when Chicago's downtown district was flooded. The "personal contracts doctrine," as its name suggests, provides only that the benefit of limited liability does not extend to certain *contractual* obligations. Specifically, contracts entered into by a shipowner "personally," rather than through the master employed for the ship, are beyond the reach of the Limitation Act. 3 Benedict on Admiralty, *supra,* at § 33. The only contractual obligation of Great Lakes that has been cited to this court and that might fall in to this category is its duty

"to indemnify the City ... against all ... loss" arising out of the installation of the piling clusters.[11] Mem.Op. & Ord. at 30–31. Contracts are "personal" to a corporate shipowner, however, only if they are executed by managerial employees acting within the scope of their discretion and authority. 3 Benedict on Admiralty, *supra,* at § 33. *See also* discussion *supra* at 231 & n. 10. The present record is so undeveloped that we cannot determine the status of the employee who signed the contract on Great Lakes' behalf. Nor is it clear whether the contract imposes liability on Great Lakes for injuries to third parties. These are all matters that can be addressed by the district court on remand. In no event, however, will the personal contracts doctrine affect the potential limitation of tort liability.

For the foregoing reasons, the judgment of the district court is REVERSED and the case REMANDED for further proceedings not inconsistent with this opinion.

11. We assume, without deciding, that indemnity contracts are "personal" in the sense that a shipowner may not have the benefit of the Limitation Act against liabilities flowing out of them. *See S & E Shipping Corp. v. Chesapeake & Ohio Ry. Co.,* 678 F.2d 636, 644 (6th Cir.1982).