In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2862

Robbin Weaver,

Plaintiff-Appellant,

v.

Hollywood Casino-Aurora, Inc.,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 2947--Elaine Bucklo, Judge.

Argued February 13, 2001--Decided June 21, 2001


   Before Manion, Kanne, and Evans, Circuit
Judges.

   Manion, Circuit Judge.  Robbin Weaver, a
slot machine attendant, was injured on a
riverboat casino owned by Hollywood
Casino-Aurora Inc. ("Hollywood"). She
sued for relief under general maritime
jurisdiction, 28 U.S.C. sec. 1333, and
the Jones Act, 46 U.S.C. sec. 688, et
seq. The district court held a bench
trial, and awarded Weaver $20,000 under
the Jones Act for pain and suffering, but
found that there was no causal connection
between the injury and some of Weaver's
physical complaints. The district court
also denied maintenance and cure, as well
as attorneys' fees. Weaver appeals the
causation ruling, the denial of
maintenance and cure, and the denial of
attorneys' fees. Because the record is
insufficient to determine whether
jurisdiction existed in the district
court over Weaver's suit, we remand for
further proceedings.

I.

   On May 15, 1995, Weaver was employed as
a slot machine attendant on the City
Lights I, a riverboat casino owned by
Hollywood./1 A movable chest of drawers
containing coins and tokens, known as a
"bank," fell on another employee. These
banks are quite heavy, weighing between

1,000 and 1,500 pounds, and Weaver injured her left wrist while helping to push the bank off the other employee's foot. This was the second time in two days that a bank had fallen over, so Hollywood apparently knew they were unstable.

Weaver filed suit in federal district court under general maritime jurisdiction and the Jones Act, seeking damages for injuries arising from the incident. The district court held a bench trial. Hollywood argued that the district court lacked jurisdiction under the Jones Act because a boat whose primary purpose is gaming is not a Jones Act vessel. In an effort to resolve this issue, the parties orally stipulated that the boat had navigational equipment, engines, a crew, and a raked bow. At the behest of Weaver's counsel, Hollywood also stipulated that the boat "cruises on a navigable waterway." Moments later, however, in response to a question from the court, Hollywood's counsel stated that the City Lights I can only travel "[t]hree hundred yards, because there is a dam on the one side and a bridge on the other side." The parties also stipulated that the purpose of the boat was gambling.

The district court subsequently rejected Hollywood's jurisdictional argument, concluding that a gaming ship "can be a Jones Act vessel," and holding that "[b]ecause the defendants have not come forward with any evidence of special circumstances that would defeat Ms. Weaver's jurisdictional showing," Jones Act jurisdiction existed. Weaver, 121 F.Supp.2d at 1170. Hollywood did not raise the jurisdictional issue on appeal, but during oral argument this court raised the question, and we later ordered supplemental briefing on whether Jones Act and general maritime jurisdiction existed in light of the parties' factual stipulations before the district court.

II.

While Hollywood did not appeal the district court's holding that it had jurisdiction under the Jones Act, and the issue of general maritime jurisdiction was not even discussed below, "[n]o court may decide a case without subject matter jurisdiction, and neither the parties nor

their lawyers may stipulate to jurisdiction or waive arguments that the court lacks jurisdiction." United States v. Tittjung, 235 F.3d 330, 335 (7th Cir. 2000). Indeed, "[i]t is the duty of this court to 'satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review.'" EEOC v. Chicago Club, 86 F.3d 1423, 1428 (7th Cir. 1996) (citing Mitchell v. Maurer, 293 U.S. 237, 244 (1934)). Accordingly, if the parties do not do so, then a court must raise the jurisdictional question on its own, as we have done in this case. See Tittjung, 235 F.3d at 335; see also Florio v. Olson, 129 F.3d 678 (1st Cir. 1997) (considering sua sponte the question of whether admiralty jurisdiction existed).

We review de novo the district court's legal determination of whether subject matter jurisdiction exists, CCC Inform. Services, Inc. v. Amer. Salvage Pool Assoc., 230 F.3d 342, 345-46 (7th Cir. 2000), and we review the district court's factual determinations for clear error. See Galva Foundry Co. v. Heiden, 924 F.2d 729 (7th Cir. 1991).

A.  Maritime Jurisdiction/2

The Constitution extends to Article III courts the power to hear "all Cases of admiralty and maritime Jurisdiction." U.S. Const. art. III, sec. 2. That power was codified at 28 U.S.C. sec. 1333(1), which provides for "original jurisdiction . . . of . . . [a]ny civil case of admiralty or maritime jurisdiction . . . ."

Historically, the only question in determining whether admiralty or maritime tort jurisdiction existed was whether the tort occurred on navigable waters. See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 531 (1995). Over time, the test has been refined. Now, "a party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. sec. 1333(1) over a tort claim must satisfy conditions of location and of connection with maritime activity." Grubart, 513 U.S. at 534.

There is thus a two-prong test for jurisdiction. The locality test reflects the traditional requirement that a tort occur on navigable waters. The

requirement of a connection with maritime activity, also known as the nexus test, raises two issues. The court must first determine whether the incident involved has "a potentially disruptive effect on maritime commerce," and second, whether "'the general character' of the 'activity giving rise to the incident' shows a 'substantial relationship to traditional maritime activity.'" See Grubart, 513 U.S. at 534 (quoting Sisson v. Ruby, 497 U.S. 358, 364, 364 n.2, 365 (1990)). We begin with the location test.

1.  Location on navigable waters.

As the Supreme Court has explained, "[a] court applying the location test must determine whether the tort occurred on navigable water." See id. The seminal case on navigable rivers is The Daniel Ball, 77 U.S. 557 (1870). The Daniel Ball set forth the following test:

Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. And they constitute navigable waters of the United States within the meaning of the acts of Congress, in contradistinction from the navigable waters of the States, when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water.

Id. at 563. See also Grubart, 513 U.S. at 530 (citing The Daniel Ball, 77 U.S. at 563)./3

The suitability of a river for interstate commerce, i.e., navigability in fact, is thus crucial to general maritime jurisdiction. As we have noted previously, "[t]he logic of requiring commercial activity is evident. The purpose behind the grant of admiralty jurisdiction was the protection and promotion of the maritime shipping industry through the development and

application, by neutral federal courts, of a uniform and specialized body of federal law." Chapman, 575 F.2d at 149 (quoting Adams v. Montana Power Co., 528 F.2d 437, 439 (9th Cir. 1975)). See also Sisson, 497 U.S. at 362. "No purpose is served by application of a uniform body of federal law, on waters devoid of trade and commerce, to regulate the activities and resolve the disputes of pleasure boaters . . . . [T]he burdening of federal courts and the frustrating of the purposes of state tort law would thereby be served." Chapman, 575 F.2d at 149-50 (quoting Adams, 528 F.2d at 440-41) (emphasis added).

In this case, the parties stipulated that the Fox River (on which the riverboat casino was located) is navigable./4 Weaver claims that this is a factual concession that the river is navigable in fact. Accordingly, she urges this court to find that the location test is satisfied.

If this stipulation were all the record had to offer, Weaver might be correct. But Hollywood contends that the statement that the Fox River was navigable was a reference to the river generally, not to the portion of the river where the tort occurred, and cites for support its statement to the district court that the boat was confined within a small portion of the river. Weaver has never questioned Hollywood's testimony that the riverboat casino could only move "[t]hree hundred yards, because there is a dam on the one side and a bridge on the other side." Hollywood thus argues that the river cannot be navigated at the point where the City Lights I was located.

Indeed, the fact that a river as a whole is navigable is not dispositive for purposes of maritime law. See, e.g., Leblanc v. Cleveland, 198 F.3d 353 (2d Cir. 1999) (dammed river not navigable even though it was capable of supporting interstate commerce downstream from the location at issue). See also Three Buoys Houseboat Vacations U.S.A. Ltd. v. Morts, 921 F.2d 775 (8th Cir. 1990) (finding non-navigable a lake with an impassable dam); Chapman, 575 F.2d 147 (holding that admiralty jurisdiction did not extend to tort claims on waters which once supported commercial transportation but subsequently only supported recreational

activities). The key to determining whether there are navigable waters is the river's present navigability where the injury transpired.

For example, the Second Circuit recently held that there was no admiralty jurisdiction in a case involving an accident between a kayak and a recreational motor boat on the Hudson River. See Leblanc, 198 F.3d 353. In Leblanc, the court held that the river was not navigable at the location of the accident because of rapids, dams, and several waterfalls, despite the fact that other portions of the river were navigable and the river as a whole was historically used for commerce. Accordingly, the Leblanc court determined that there was no admiralty jurisdiction.

The case before us presents a similar factual scenario. Based on the stipulations in this case, it is probable that the waters in which the City Lights I made its 300-yard trips are not "navigable in fact." The dam and bridge which obstructed the City Lights I indicate--at this location--a river which cannot be used as a highway for maritime commerce. A dam and bridge which prevent a riverboat casino from traveling over 300 yards are presumably not susceptible to commercial shipping, and thus fail the test set forth in The Daniel Ball.

In addition, if the enclosed portion of the Fox River at issue here is not navigable upstream or downstream for commercial shipping, it is also impossible to engage in interstate travel from this location. This part of the river, located in Aurora, Illinois, is entirely intrastate. "Those cases in which circuit courts have found dammed waterways navigable for jurisdictional purposes are easily distinguished by the fact that the waterway in question formed the border between two states, thereby rendering it capable of supporting interstate commerce despite the existence of artificial dams blocking downstream flow." Leblanc, 198 F.3d at 359. Because the waterway in this instance is located entirely within the state of Illinois, and given the circumstances of this case, we conclude that this small, enclosed, intrastate section of river is unlikely to qualify as a navigable water under general maritime law./5

Even so, it is theoretically possible that although the river is impassable for the City Lights I (a boat whose dimensions might differ significantly from the dimensions of other craft), this part of the river could still serve as a continuous highway for other vessels designed for commercial shipping. While the record is silent on this question, outside sources indicate that the Fox River is very likely not navigable. A detailed map reveals that the Fox River is riddled with dams, both within the confines of the city of Aurora and within a short distance upstream and downstream of the city./6

Despite these apparent obstructions to navigation, it appears from the record that no consideration was given to the possibility that the evidence precluded the river from meeting the legal test for navigability. There was certainly no reference to navigability in the district court opinion. Although Hollywood argues strenuously in its supplemental brief that the absence of navigable waters precluded jurisdiction, this is the first time this claim has been raised./7 Indeed, Hollywood's counsel only noted that the dam and bridge were impassable in response to a question from the district court about how the City Lights I navigates, a question which was not aimed at the location test.

In this context the parties' stipulations could be read to concede that the Fox River is navigable in fact. In many cases uncontested factual stipulations can resolve a jurisdictional question. Cf. Workman v. United Parcel Service, Inc., 234 F.3d 998, 999-1000 (7th Cir. 2000). District courts are not required to second-guess the parties' stipulations to jurisdictional facts. For example, "[i]f the plaintiff in a diversity suit alleges, and the defendant admits, that the defendant is incorporated in Delaware, the district judge is not required to run to Moody's to see whether it really is a Delaware corporation, or to insist on the production of a certified copy of the defendant's certificate of incorporation." Prizevoits v. Indiana Bell Telephone Co., 76 F.3d 132, 134 (7th Cir. 1996).

However, "[t]he rule against obtaining federal jurisdiction by consent . . . would be ineffectual if parties by stipulating to jurisdictional facts could remove them entirely from judicial scrutiny." Id. at 135 (citations omitted). "[I]f . . . facts brought out in pretrial discovery or at trial, fairly shriek that there is no federal jurisdiction, the district judge must conduct whatever supplementary factual proceedings are necessary to resolve the doubt." Kanzelberger v. Kanzelberger, 782 F.2d 774, 777 (7th Cir. 1986). Although the district court did not do so here, the appellate court, as noted, must also satisfy itself of federal jurisdiction over the case, and may order a case dismissed when there is no doubt that the district court lacked jurisdiction. See, e.g., id. (citing Bialac v. Harsh Bldg. Co., 463 F.2d 1185 (9th Cir. 1972) (dismissing case where factual stipulation supporting diversity of parties was clearly false)).

In this case, the record makes it unlikely that jurisdiction existed, and the district court has made no inquiry into the navigability of the Fox River where the City Lights I was located. A remand is appropriate in these circumstances so the district court may determine whether subject matter jurisdiction exists. See Freeman v. Northwest Acceptance Corp., 754 F.2d 553 (5th Cir. 1985) (remanding to district court after trial where plaintiff's assertion of diverse parties was unlikely to be true). See also Kanzelberger, 782 F.2d at 777 (citing Freeman with approval).


   2.  Connection with maritime activity.

   Hollywood also argues that the second requirement for general maritime jurisdiction, a "connection with maritime activity," was not met by the facts in the record. First, Hollywood argues that Weaver's injury does not have the required potential effect on maritime commerce. In determining whether this requirement is met, a court must consider the incident giving rise to the claim at an "intermediate level of generality." See Grubart, 513 U.S. at 538. The court should not consider the particular facts of the case before it, but must instead

"assess the general features of the type of incident involved to determine whether such an incident is likely to disrupt commercial activity." Sisson, 497 U.S. at 363.

Weaver claims the appropriate description of the incident would be "an injury occurring during rescue efforts on a vessel on navigable waters." Hollywood counters that the better description would be "an injury to a slot machine attendant on a floating casino that cannot move beyond a confined area of water." Hollywood thus argues that the events giving rise to Weaver's injury could not possibly affect maritime commerce.

Hollywood's description of the incident in this case is too narrow and specific. Cf. Grubart, 513 U.S. at 539 (incident described as "damage by a vessel in navigable water to an underwater structure" sufficiently indicated potentially disruptive impact on maritime commerce); Sisson, 497 U.S. at 363 (incident described as "fire on a vessel docked at a marina on navigable waters" satisfied potential disruption requirement). Weaver's description more closely captures the general features of the incident, although she narrows the focus by including the detail that she was involved in "rescue efforts." A more appropriate description would be an injury on board a vessel on navigable waters (on the condition, of course, that the court finds that the waters are navigable).

The next step is to determine what the potentiality for the disruption of maritime commerce is, based on the general features of the incident. The key is not whether the incident affected maritime commerce, but whether it could do so. In Sisson, for example, the Supreme Court thought it relevant that a fire on board a recreational boat at a marina could impact other ships engaged in maritime commerce, even though the boat involved was not engaged in commerce.

Courts have used differing standards to determine the potential for disruption of maritime commerce. Compare H2O Houseboat Vacations, Inc. v. Hernandez, 103 F.3d 914 (9th Cir. 1996) (finding no potential

disruption of maritime commerce where houseboat occupants were injured by carbon monoxide fumes which could not harm other boats, and refusing to speculate on possible harms where to do so would ignore the actual incident) with Bay Casino LLC v. M/V Royal Empress, 1999 WL 33218594 (E.D.N.Y.) (finding potential disruption of maritime commerce where a passenger was served liquor during a cruise and subsequently injured plaintiff while driving on land); Young v. Players Lake Charles, L.L.C., 47 F.Supp. 2d 832, 835 (S.D. Tex. 1999) (excessive amount of alcohol served to casino patron while on navigable waters). See also Delta Country Ventures, Inc. v. Magana, 986 F.2d 1260, 1264 (9th Cir. 1993) (Kozinski, J., dissenting) (disagreeing with majority's level of generality, while recognizing that "disputes about the appropriate level of generality always carry with them a certain degree of arbitrariness.").

This case does not require us to speculate, however. The City Lights I was a commercial boat engaged in the transport of passengers for profit (even if its ultimate end was gambling), and without doubt an injury to one of its crew disrupts its participation in maritime commerce. Cf. Great Lakes Dredge & Dock Co. v. City of Chicago, 3 F.3d 225, 230 (7th Cir. 1993), aff'd sub nom. Grubart, 513 U.S. 527 (1995) ("Because commerce on the river was actually disrupted for more than a month, this question answers itself. Yes, there was such a potential. In fact, it was realized.").

If the district court finds on remand that the river is navigable, then the substantial relationship to traditional maritime activities requirement is easily met in this case. The Supreme Court has held that even noncommercial vessels when navigating in navigable waters have a substantial relationship to traditional maritime activities. See Foremost Ins. Co. v. Richardson, 457 U.S. 668 (1982)./8 On this record the City Lights I was navigating when the incident occurred. The general character of the riverboat's activity thus relates to traditional maritime activity. Accordingly, the nexus test would be met, and it only remains to determine on remand whether Weaver's injury occurred in navigable waters.

B.  The Jones Act

   Weaver alleged another basis of jurisdiction, one on which the district court relied, namely the Jones Act. The Jones Act provides jurisdiction for a "seaman" who suffers personal injury in the course of his employment. 46 U.S.C. sec. 688. To qualify as a seaman under the Jones Act, "an employee's duties must 'contribut[e] to the function of the vessel or to the accomplishment of its mission.'" McDermott Int'l Inc. v. Wilander, 498 U.S. 337, 355 (1991) (quoting Offshore Co. v. Robison, 266 F.2d 769, 779 (5th Cir. 1959)). In addition, "a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature." Chandris v. Latsis, 515 U.S. 347, 368 (1995).

   Weaver argues that "[i]n contrast to general maritime law, there is no locality requirement for the Jones Act . . . ." While Weaver is correct that the Jones Act does not focus on the location of the vessel at the time of the injury, Jones Act jurisdiction still requires a relationship to navigable waters. This is because jurisdiction under the Jones Act "depends 'not on the place where the injury is inflicted . . .  but on the nature of the seaman's service, his status as a member of the vessel, and his relationship . . . to the vessel and its operation in navigable waters.'" Chandris, 515 U.S. at 359–60 (quoting Swanson v. Marra Bros., Inc., 328 U.S. 1, 4 (1946)) (emphasis added). Thus, a ship with no connection to navigable waters is not a source of Jones Act jurisdiction. See also Johnson, 742 F.2d at 1063.

   The Third Circuit's recent decision in Reeves v. Mobil Dredging & Pumping Co., Inc., 26 F.3d 1247 (3rd Cir. 1994), confirms this conclusion. As the Reeves court explained, "[a]lthough the requirement is not expressly stated in the [Jones Act], the Supreme Court has long required that the injury occur through the employee's relationship to a vessel on a navigable body of water." See id. at 1253 (citing Swanson, 328 U.S. at 6) (emphasis in original). Accordingly, the Reeves court concluded that the Jones Act did not provide jurisdiction over a

claim arising on a vessel in a man-made, landlocked lake located entirely within the Commonwealth of Pennsylvania.

If the water at issue in this case is similarly locked between a bridge and a dam (or is impassable to commercial shipping because of adjacent dams both upstream and downstream), as in Reeves the Jones Act would not provide jurisdiction. But as noted above, the record sheds insufficient light on this question. Therefore, the district court must determine on remand whether Weaver was employed on a boat with the requisite relationship to navigable waters for purposes of the Jones Act.

Hollywood also contests the district court's holding that the City Lights I is a "vessel" for Jones Act purposes. As noted by the Fifth Circuit, the term "vessel" has not been precisely defined in this context. See Gremillion v. Gulf Coast Catering Co., 904 F.2d 290, 293 (5th Cir. 1995) ("[I]t has been suggested that 'three men in a tub would also fit within our definition, and one could probably make a convincing case for Jonah inside the whale.'") (quoting Burks v. American River Transp. Co., 679 F.2d 69, 75 (5th Cir. 1982)). If the casino were indefinitely moored (as the record suggests it is now), its status as a vessel in navigation would be doubtful. See Pavone v. Miss. Riverboat Amusement Corp., 52 F.3d 560, 570 (5th Cir. 1995). There is some difference of opinion, however, on when floating casinos which travel on a river are Jones Act vessels. Compare Davis v. Players Lake Charles Riverboat, Inc., 74 F.Supp.2d 675 (W.D.La. 1999) (finding a riverboat casino was not a vessel because any navigation was incidental to the boat's primary purpose of gambling) with Wiora v. Harrah's Illinois Corp., 68 F.Supp.2d 988 (N.D.Ill. 1999) (Williams, J.) (finding a riverboat casino was a vessel where it traveled on navigable waters).

If the riverboat casino were a traditional craft navigating in navigable waters, it would presumably be a vessel and the Jones Act would apply. See Gremillion, 904 F.2d at 293. But Hollywood claims that the City Lights I, in its role as a riverboat casino, is an unconventional craft. In order to determine vessel status for an

unconventional craft, "it is necessary to focus upon the 'purpose for which the craft is constructed and business in which it is engaged.'" See id. (quoting Blanchard v. Engine & Gas Compressor Servs., Inc., 575 F.2d 1140, 1142 (5th Cir. 1978)). According to the parties' stipulation the purpose of the City Lights I was gambling. Citing Davis, Hollywood argues that the casino therefore cannot be a Jones Act vessel, even if it makes short trips over navigable water.

Weaver does not agree that the City Lights I is an unconventional craft. Weaver also contends that the Davis case is bad law, and that Supreme Court precedent requires us to consider the activity of the City Lights I not as gambling, but as navigation.

We conclude based on the stipulations regarding the boat's engines, crew, and other traditional vessel characteristics that the City Lights I is or at least was a traditional vessel. Cf. Gremillion, 904 F.2d at 293 (listing some attributes of traditional vessels). Hollywood nevertheless contends that the casino is an unconventional craft because it only navigates the Fox River to comply with the then-Illinois statutory requirement that gambling boats do so./9 The problem for Hollywood is that this very circumstance defeats their argument, even if the City Lights I were an unconventional craft. Navigation is so intertwined with gambling in this particular case that it is impossible to extricate the one from the other. Under the then-existing law the casino was required to navigate the river whenever it hosted gambling activities. In other words, a primary purpose of the riverboat was navigation--although it was also a means to an end, navigation was hardly incidental to the activities of the City Lights I. Accordingly, jurisdiction would exist if the district court determines on remand that the boat at the time of the injury had the requisite connection with navigable waters.

III.

The stipulations before the district court raise serious questions whether the district court possessed subject matter jurisdiction over Weaver's claims, under

both federal maritime law and the Jones Act. Because the record is not sufficiently developed for us to determine whether jurisdiction exists, this case is REMANDED for proceedings in accord with this opinion.

FOOTNOTES

/1 In light of our jurisdictional holding, we present only a brief overview of the background events leading to Weaver's suit, which for the most part are not relevant to our decision below. For a more in-depth discussion of the events giving rise to this case, see Weaver v. Hollywood Casino Aurora, Inc., 121 F.Supp.2d 1169 (N.D. Ill. 2000).

/2 The terms "admiralty" and "maritime" are used interchangeably for purposes of this opinion as the precedents discussed below use both terms. As noted by a leading treatise, "[i]nsofar as the reference is to substantive law, the terms 'admiralty' and 'maritime law' are virtually synonymous in this country today, though the first derives from the connection of our modern law with the system administered in a single English court, while the second makes a wider and more descriptive reference." Grant Gilmore and Charles L. Black, Jr., The Law of Admiralty sec. 1-1 (2d ed., 1975).

/3 The definition of "navigable waters" in one context does not necessarily apply in other contexts. See Kaiser Aetna v. United States, 444 U.S. 164, 171-72 (1979). The definition of navigable waters for Commerce Clause purposes generally extends beyond the definition in the context of maritime law. See Chapman v. United States, 575 F.2d 147, 149-50 (7th Cir. 1978) (en banc), cert. denied, 439 U.S. 893 (1978).

/4 The Fox River discussed herein should not be confused with Wisconsin's Fox River, the navigability of which is analyzed at length in The Montello, 87 U.S. 430 (1874).

/5 It may seem strange for a boat with crew, engines, etc., to be placed in such a location. At the time of Weaver's injury, Illinois required gambling facilities to travel on water. The statute was subsequently amended to eliminate the requirement. See 230 ILCS 10/11(1).

/6 In fact, a regional website devoted to paddle-boating offers detailed instructions and Census Bureau coordinates so that recreational parties may portage around Aurora's several dams. See http://www.chicagopaddling.org.

/7 Before the district court, Hollywood's counsel stated that the question of whether the floating casino was engaged in a traditional maritime activity was the only issue raised ("I'm not contesting that she was working aboard the vessel, that the vessel was in navigation, all the other factors that would be considered."). R.43 at 66.

/8 Hollywood also argues that there is no substantial relationship to traditional maritime activities because the riverboat casino is not a "vessel" under maritime law. However, for these purposes "a craft is a 'vessel' if its purpose is to some reasonable degree 'the transportation of passengers, cargo, or equipment from place to place across navigable waters.'" Great Lakes Dredge & Dock Co., 3 F.3d at 229 (quoting Johnson v. John F. Beasley Constr. Co., 742 F.2d 1054, 1063 (7th Cir. 1984), cert. denied, 469 U.S. 1211 (1985)). Assuming the navigable waters requirement is met, the riverboat in this case is clearly a vessel for purposes of general maritime jurisdiction.

/9 The fact that the casino "navigates" the Fox River is of course not relevant to a determination whether the river is legally a "navigable water." A craft could navigate a swimming pool without the pool qualifying as navigable in the sense required for jurisdiction.