William **MARSHALL** and Brenda Marshall, Plaintiffs,

v.

**WELLCRAFT MARINE, INC.** Genmar, Inc. Defendant,

**Pompanette, Inc. Bomar, Inc., Defendant.**

No. IP 98–1722–C B/S.

United States District Court, S.D. Indiana, Indianapolis Division.

Nov. 4, 1999.

---

R Stephen Donovan, Mooresville, IN, for plaintiffs.

Albert J Dahm, Baker & Daniels, Fort Wayne, IN, Suzann Weber Lupton, Baker & Daniels, Indianapolis, IN, for defendants.

### ENTRY GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

BARKER, Chief Judge.

Plaintiffs, William and Brenda Marshall ("Marshalls"), originally filed this products liability and breach of contract and warranty action in the Morgan Superior Court. Defendants, Wellcraft Marine, Inc., a subsidiary of Genmar Industries, and Pompanette, Inc., a division of Bomar, Inc, removed the case to this court based

upon both diversity of citizenship and federal question jurisdiction. Plaintiffs contend that while navigating their 46–foot yacht from Florida to the Bahamas, a design defect in the yacht's "portlights" caused the yacht to take on sea water, which damaged the yacht and the Marshalls' personal property, and which electrically shocked William Marshall as he attempted to prevent the ship from sinking. Defendants contend that maritime law governs plaintiffs' products liability claim, which must be dismissed because, according to defendants, only the yacht sustained damage during the incident. Defendants also move for dismissal of plaintiffs' breach of contract and warranty claims. For the reasons discussed below, we *GRANT* defendants' motion for summary judgment with respect to the breach of contract and warranty claims, but we *DENY* their motion with respect to the products liability claim governed by maritime law.

### Background [1]

In April 1996, the Marshalls purchased a used 1994 Wellcraft 46 Cockpit Motoryacht, operating under the name of "JUST ENOUGH," from a Florida boat dealer. *See* Defs.' Statement of Material Facts ("Def.St.Facts") ¶ A1; W. Marshall Decl. ¶ 2. The Marshalls were second owners of the 46–foot pleasure craft. *See* Def. St. Facts ¶ 2. Defendant Wellcraft Marine ("Wellcraft") manufactured the yacht in 1993, which included two Model 819–stud portlights, also referred to by the parties as "portholes," which defendant Pompan-

---

1. Plaintiffs failed to comply with Local Rule 56.1, which requires a party opposing summary judgment to file a "Response to Statement of Material Facts," with each stated material fact "substantiated by specific citation" to admissible evidence. *See* Local Rule 56.1(b)(2), (f)(2). Plaintiffs' "Factual Introduction" is neither numbered to correspond to defendants' "Statement of Material Facts," nor are any of plaintiffs' factual propositions substantiated by citation to admissible evidence. Therefore, we will assume the truth of the uncontroverted facts claimed by defendants that they also support with admissible

evidence. *See* Local Rule 56.1(g); *Flaherty v. Gas Research Inst.*, 31 F.3d 451, 453 (7th Cir.1994) ("District courts are not obliged in our adversary system to scour the record looking for factual disputes. They instead may deem the [uncontroverted] fact admitted.") (citations and quotations admitted). However, in an attempt to read the record in a light most favorable to plaintiffs, as we must, we cite to relevant portions of William Marshall's declaration (plaintiffs' primary evidence in support of their claims) where appropriate for a complete factual recitation.

ette, Inc., manufactured.[2] *See* Defs.' Mot. Summ. J. ¶ 1; Hudak Decl. ¶ 8. In 1994, defendant Wellcraft sold its boats subject to the "Wellcraft Limited Warranty on New 1994 Model Wellcraft Boats." Hudak Decl. ¶ 7 (Ex. A, Limited Warranty). This warranty, which lasted either one or five years depending upon the item damaged, extended to the "first retail purchaser of its 1993 and later model year products." *Id.* The portlights on JUST ENOUGH failed during the Marshalls' voyage from Florida to the Bahamas, prompting the lawsuit now before us.

The parties agree that during the morning of June 13, 1997, the Marshalls departed from a Florida port with three other boats (later joined by a fourth) and began what they anticipated would be an enjoyable vacation in the Bahamas. *See* Def. St. Facts ¶ B1; Compl. ¶ 7. That evening, at roughly the half-way point during the group's crossing to Grand Bahama Island, William Marshall discovered that both portlights were either completely broken or seriously leaking. *See* Def. St. Facts ¶ B2; Compl. ¶ 8. Panic ensued, exacerbated by the approach of a "micro-storm" that increased the flow of water into the Marshalls' boat. Compl. ¶ 9. The influx of salt water into the yacht's cabin apparently short-circuited the electrical equipment, including navigational and communication devices. *See* W. Marshall Decl. ¶ 5. William Marshall attempted to stem the flow of water through the portlights by jamming bedding, canvas, and other items into the open holes, all the while receiving shocks from contact with electrically-charged water. *Id.* ¶ 6. Despite the Marshalls' inability to communicate with the other vessels in their convoy, they soon discovered JUST ENOUGH's plight and provided assistance. *See* Compl. ¶¶ 12, 17. JUST ENOUGH continued traveling under its own power, with the Marshalls managing to bail enough water to keep their boat afloat, mainly by engaging bilge pumps and reducing speed to minimize water intake. *See* W. Marshall Decl. ¶ 8; Compl. ¶ 17. The Marshalls also benefitted from the micro-storm's passing, which presumably minimized the size of waves hitting the hull and reduced the amount of water entering through the portlights. Fortunately, JUST ENOUGH proved true to its name, as the disabled yacht and accompanying boats safely reached the Bahamas the next morning.

The Marshalls contacted Wellcraft upon arriving in the western Bahamas to apprise them of their ordeal. James Guess ("Guess"), Director of Customer Service at Wellcraft, arranged for overnight delivery of higher quality portlights to the Ocean Reef Marina, Grand Bahama Island, in order to accommodate the Marshalls' return to Florida. *See* Guess Decl. ¶ 5; Hudak Decl. ¶ 12. Guess testified that although he believed that the Marshalls were excluded from warranty coverage, Wellcraft's commitment to customer service prompted him to offer Wellcraft's assistance under the circumstances. *See* Guess Decl. ¶ 4. (Mark Hudak, who replaced Guess as Director of Customer Service in the Spring of 1998, also testified that although he continued Guess' efforts to assist the Marshalls through their ordeal, he did not act under the belief that a warranty entitled the Marshalls to any recovery. *See* Hudak Decl. ¶¶ 9–11). At some point within the next few days, a service yard in the Bahamas apparently effectuated the necessary repairs at Wellcraft's expense, and the Marshalls eventually returned to Florida after completing their vacation without further complications.

In the months following the incident, the Marshalls and James Guess worked together via phone and letter in an attempt to restore JUST ENOUGH to its pre-incident condition. On September 5, 1997,

---

**2.** The parties do not provide us with a description of a "portlight," but we have deduced from the record that the devices were sufficiently low on the both the port and starboard sides of the yacht's bow hull that their placement resulted in a flood of water entering the lower cabin.

the Marshalls sent Wellcraft a lengthy list of requests, entitled "Compromise of settlement," which proposed that Wellcraft repair JUST ENOUGH, upgrade and improve the vessel from its pre-incident condition, and compensate the Marshalls for lost and damaged personal property, various expenses, and "injuries, trauma, and stress." Guess Decl. (Ex. A, Pls.' Sept. 5, 1997, letter). Specifically, in addition to repairing the yacht (repairs valued at over $40,000), the Marshalls requested an electronics upgrade (valued at over $18,000), the addition of a Jacuzzi in the Master Stateroom (among other improvements), over $5,000 for alleged lost or damaged personal property (which included a $700 "surcharge" for "inconvenience of replacement"), over $9,000 for lost use of the vessel, $25,000 for alleged injuries and "horror and trauma," and approximately $400 for reimbursement of other out-of-pocket expenses, such as a propeller change in the Bahamas. *Id.*

The parties disagree on what concessions Wellcraft made to accommodate the Marshalls' requests. By all accounts, Wellcraft agreed to repair JUST ENOUGH and to upgrade the vessel with an electronics package, in addition to paying for the cost of repairs in the Bahamas. William Marshall also claims that Wellcraft represented that it would replace any damaged or lost personal property and that James Guess agreed to compensate the Marshalls "for any personal loss." W. Marshall Decl. ¶¶ 12, 15. James Guess testified that he informed the Marshalls that Wellcraft would not compensate them for any personal property or loss of use, although he agrees that Wellcraft committed to repair the boat and find a suitable method to compensate the Marshalls for their inconvenience. *See* Guess Decl. ¶ 7.

In an October 30, 1997, letter from Guess to William Marshall, Guess confirmed that Wellcraft had authorized repairs to JUST ENOUGH and that those efforts had commenced. The letter also documented that the parties were negotiating for the electronic equipment upgrade, with Guess requesting that Mar-

shalls "let me know what electronics you are looking for, I have an open mind, however, I need to know what you want." *Id.* (Ex. B). The letter also notified the Marshalls that Wellcraft had issued a check for almost $900 to cover the transportation costs and other expenses associated with delivering JUST ENOUGH to Rybovich Spencer ("Rybovich"), a boat yard specializing in "building, customizing and repairing high-end yachts." Guess Decl. ¶ 8. The parties previously had agreed that Rybovich would perform the necessary repairs, so the Marshalls had delivered JUST ENOUGH to that boat yard sometime in September 1997. *See* Withey Decl. ¶ 6. Rybovich apparently performs most of its work on custom yachts, not on pre-manufactured boats similar to JUST ENOUGH, and its repair rates are therefore higher than other boat yards. *Id.* ¶ 3. However, Wellcraft acceded to paying a premium rate to ensure a comprehensive and quality repair to the Marshalls' boat. Similarly, the Marshalls had researched a number of other marine yards in Central Florida, which proved unable to complete the repairs without subcontracting a substantial portion of the work. *See* W. Marshall Decl. ¶ 16. These other repair yards also disavowed any responsibility for the quality or scheduling of any subcontracted labor. *Id.* Hence, the Marshalls requested and received Wellcraft's authorization to have Rybovich complete the authorized repairs. James Guess' October 30, 1997, letter to William Marshall concluded with Guess notifying Marshall that Wellcraft would send him a $870 check for the propeller (repaired in the Bahamas) and the dinghy, both of which were damaged during the course of the portlight incident.

Over the course of approximately seven months, from September 21, 1997, to April 12, 1998, Rybovich completed repairs, upgrades, and additional work requested by the Marshalls. During that period, Rybovich submitted two separate service proposals to the Marshalls and Wellcraft, dated October 9, 1997, and December 17,

1997. Rybovich partially relied on two marine surveyors' reports of the damage to JUST ENOUGH (the Marshalls arranged both reports and hired the surveyors) in arriving at their service proposals.[3] Thurber Withey, Rybovich's project manager for the restoration of JUST ENOUGH, testified that he submitted two proposals so that Rybovich could begin repairs on the items in the October 9, 1997, proposal while the remaining repairs were being negotiated by the parties, which additional repairs were eventually memorialized in the December 17, 1997, service proposal, although even the latter proposal stated, "electronics to be discussed with customer." Withey Decl. (Ex. D). Wellcraft made no representation regarding the length of time required to complete the repairs. See Def. St. Facts ¶ D6.[4]

Delays inevitably occurred in the rehabilitation of JUST ENOUGH, primarily due to the availability schedule by which Rybovich allocates its resources to repair yachts and because of the extensiveness of the repairs. When work on a particular boat stops because of a lack of materials or absent the required consent to proceed with the next task, Rybovich pulls a boat out of rotation and allocates its resources elsewhere. See Withey Decl. ¶ 12. When materials arrive or when Rybovich secures work authorization, the boat returns to the rotation, but again must await the availability of resources. Id. Rybovich apparently removed JUST ENOUGH from service rotation on various occasions while it awaited decisions from both parties on certain repair items. See Def. St. Facts

¶¶ 20–29. For instance, Wellcraft acknowledges that in approving specific repair items, its need to obtain authorization from supervisory personnel occasionally delayed its ability to give Rybovich immediate approval for certain repairs. Id. ¶ 20; Guess Decl. ¶ 15. The Marshalls also bear responsibility for delays in selecting such items as interior fabrics and the content of electronic components to be installed on the boat. See Withey Decl. ¶ 15; Guess Decl. ¶ 16; Def. St. Facts ¶¶ 20–29. In fact, Wellcraft flew Brenda Marshall to Florida and provided an interior decorator to assist her in designing a custom interior for the boat, an expense also absorbed by Wellcraft. See Guess Decl. ¶ 10.

By April 12, 1998, Rybovich completed the agreed-upon repairs previously detailed in their two service proposals. Wellcraft's investment in rehabilitating JUST ENOUGH to its pre-incident condition totaled approximately $46,000, not including the cost of additional upgrades. See Def. St. Facts ¶¶ 18–19. As compensation for the inconvenience suffered by the Marshalls during the portlight incident, James Guess testified that Wellcraft provided the Marshalls with both the electronics package upgrade, valued at approximately $18,000, and the professional consultation in custom designing JUST ENOUGH's interior. See Guess Decl. ¶ 10. The parties agree that despite the repairs and the upgrades, Wellcraft did not specifically compensate the Marshalls for any lost or damaged personal property

3. One marine surveyor concluded that the portlight failure "appears to have been caused by a manufacture or design flaw. The portholes that were installed by the builder are evidently improper for service in the bow hull location." See Withey Decl. (Ex. B, AAA Accredited Marine Inc. report).

4. In his declaration, William Marshall claims that they "were informed that the repairs would take one or two months to complete," but he never identifies who said this, when the conversation occurred, or to what repairs the individual referred. W. Marshall Decl. ¶ 19. Nor do plaintiffs bother to consider the

hearsay implications concerning what an unidentified person said to William Marshall, especially if the individual is a Rybovich employee. The inadmissible evidence in Marshall's declaration does not stop there, however, as Marshall includes a version of his written notes about telephone conversations with Thurber Withey, project manager at Rybovich. The notes themselves are inadmissible under F.R.E. 803(5) even assuming they would qualify as a recorded recollection, and the primary content of those notes, which consists of what Withey told Marshall, is hearsay.

identified in the Marshalls' September 5, 1997, letter to Wellcraft or for loss of use to JUST ENOUGH. However, the costs to recondition the Marshalls' yacht did include expenses such as monthly dock charges while Rybovich repaired the boat. *See* Hudak Decl. (Exs. G, H, repair records and invoices).

Upon completion of the repairs and upgrades, the Marshalls also requested that Wellcraft repair or replace batteries, an ice-maker, a starter and a "Y" valve, which the Marshalls apparently claimed had failed due to the time the yacht spent under repair.[5] *See* Def. St. Facts ¶ D4; Compl. ¶ 26. After investing more than $60,000 in JUST ENOUGH, Wellcraft apparently had had more than enough, declining plaintiffs' additional requests based on its belief that the purported damage to these items was not linked to the portlight incident, but rather was associated with age and wear of the craft. *See* Hudak Decl. ¶ 18.

Plaintiffs filed their six-count complaint in state court on November 10, 1998, and, as we have previously noted, defendants filed their notice of removal to federal district court on December 15, 1998. Plaintiffs' six counts run together without clearly-defined boundaries, but we are able to determine that plaintiffs originally alleged products liability claims based on strict liability and negligence, and various breach of contract and implied warranty claims based on the portlight failures and the length of time to repair the yacht. Defendants contend in their summary judgment motion that the products liability claims fail under maritime law, arguing that any personal injury or property damage suffered by plaintiffs was *de minimis*. Defendants also observe that plaintiffs have now abandoned most of their contract and warranty claims, scarcely mentioning them in their response to summary judg-

ment. Nonetheless, defendants maintain that the parties never entered any express or implied contracts, and that plaintiffs were not entitled to the protections in Wellcraft's limited warranty because they were not the first retail purchasers. Defendants deny that any other express or implied warranties existed based on Wellcraft's advertisements of their products. We now proceed to address the legal merits of the parties' summary judgment contentions.

### Summary Judgment Standards

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *American Automotive Accessories, Inc. v. Fishman*, 175 F.3d 534, 542 (7th Cir.1999). A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the particular issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Eiland v. Trinity Hosp.*, 150 F.3d 747, 750 (7th Cir.1998). However, neither the mere existence of some alleged factual dispute between the parties, *Baulos v. Roadway Express, Inc.*, 139 F.3d 1147, 1152 (7th Cir.1998), nor the existence of "some metaphysical doubt as to the material facts," *Fairchild v. Forma Scientific, Inc.*, 147 F.3d 567, 571 (7th Cir.1998) (internal quotations omitted) (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)), is sufficient to defeat a motion for summary judgment. In considering a motion for summary judg-

---

**5.** The Marshalls fail to cite or provide any admissible evidence documenting that these items in fact failed or that either lack of use or the portlight incident caused their alleged failure; (William Marshall does not even speak to the issue in his declaration). While we suspect that Rybovich employees would possess such knowledge to either confirm or deny the allegations in plaintiffs' complaint, plaintiffs fail to offer deposition testimony, affidavits, or other admissible evidence substantiating their assertions.

ment, a court must draw all reasonable inferences in the light most favorable to the non-movant. *See Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 392 (7th Cir. 1992). Yet, if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish her case, summary judgment is not only appropriate, but also required. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Herman v. City of Chicago*, 870 F.2d 400, 404 (7th Cir.1989).

## Discussion

### I. Products Liability and Maritime Law

The parties initial dispute concerns whether maritime law governs plaintiffs' products liability claims, so we begin by addressing that threshold issue. Defendants invoke maritime law, claiming that it prohibits products liability claims when the only alleged injury occurs to the product itself. Defendants contend that any alleged personal injury suffered by plaintiffs, whether property loss or physical injury, is sufficiently nominal that the only reasonable conclusion is that the allegedly defective yacht injured only itself during the portlight incident. We agree with defendants that maritime law controls plaintiffs' products liability tort claims, but we find that plaintiffs have adduced sufficient evidence of property loss and personal injury to warrant a maritime products liability claim for damages incurred from those alleged losses.

### A. Maritime Law Governs the Marshalls' Products Liability Claims

■ An application of maritime law to plaintiffs' products liability claims depends on whether this case falls within our admiralty jurisdiction. *See Lambert v. Babcock & Wilcos, Co.*, 70 F.Supp.2d 877, 883 (S.D.Ind.1999). In *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534, 115 S.Ct. 1043, 1048, 130 L.Ed.2d 1024 (1995), the Supreme Court held that a court has admiralty jurisdiction over a tort claim if that claim "satisf[ies]

conditions both of location and of connection with maritime activity." The parties do not dispute that this case easily satisfies the location test since the portlight incident occurred on the navigable waters of the Atlantic Ocean. *Grubart,* 513 U.S. at 534, 115 S.Ct. at 1048. The only question that remains is whether the Marshalls' tort claim meets the "connection with maritime activity" test. We conclude that it does.

■ Our assessment of the connection test devolves into two separate inquires. First, we must ask whether the incident giving rise to the alleged tort had "a potentially disruptive impact on maritime commerce." *Id.* (*quoting Sisson v. Ruby,* 497 U.S. 358, 364 n. 2, 110 S.Ct. 2892, 2896 n. 2, 111 L.Ed.2d 292 (1990)); *Great Lakes Dredge & Dock Co. v. City of Chicago,* 3 F.3d 225, 228 (1993), *aff'd, Grubart,* 513 U.S. 527, 115 S.Ct. 1043. Second, we ask whether the general character of the activity giving rise to the incident establishes a "substantial relationship to traditional maritime activity." *Id.*

■ In *Lambert,* 70 F.Supp.2d at 883–84, we recently had occasion to explicate the Supreme Court's methodology in defining a potentially disruptive impact on maritime commerce. We observed that in *Sisson v. Ruby,* 497 U.S. 358, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990), the Supreme Court assessed the relationship between admiralty jurisdiction and disruptions of maritime commerce. In that case, a fire erupted in the washer/dryer unit of a large pleasure yacht docked at a recreational marina on Lake Michigan. The fire spread to other recreational vessels and the marina itself. No commercial vessels were damaged since none were docked at the marina at the time of the fire. The Court held that the jurisdictional inquiry does not require an assessment of the incident's *actual* effects on maritime commerce. Rather, admiralty jurisdiction exists if an incident creates a *"potential* hazard to maritime commerce," even though maritime commerce is in no way disturbed. *Id.,* 497 U.S. at 362, 110 S.Ct. at 2895

(*quoting Foremost Ins. Co. v. Richardson,* 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982)) (emphasis added). Moreover, in determining the existence of such a "potential hazard," a court should not consider the particular facts of the case before it, but "must assess the general features of the type of incident involved to determine whether such an incident is likely to disrupt commercial activity." *Id.*, 497 U.S. at 363, 110 S.Ct. at 2896. The Supreme Court concluded that the fire in *Sisson* "plainly satisf[ied]" this requirement, even though the fire only involved pleasure boats, since it could have damaged commercial vessels had any been docked at the time, and since the damage to the marina itself might have disrupted commercial maritime traffic. *Id.*

In this case, the hobbled JUST ENOUGH represented a potential disruption to maritime commerce in a number of ways. A yacht in distress on the high seas, crippled in its ability to rely on electronic navigational instruments and taking on water in the middle of a storm, easily could prompt commercial vessels in the vicinity to lend assistance, thereby diverting such vessels from their charted courses and disrupting their commercial operations. In a more hazardous scenario, a disabled recreational yacht may pose a threat of collision to commercial vessels, especially where, as here, the yacht travels through poor conditions during the night with malfunctioning electrical equipment, unable to communicate with approaching crafts and potentially without operational external lights marking its position. While we can imagine other disruptions to maritime commerce under the facts of this case, these examples suffice despite the fact that the likelihood of their occurrence is remote, for "a remote possibility of impact on maritime commerce [is] . . . enough to support admiralty jurisdiction." *Great Lakes Dredge,* 3 F.3d at 228. Therefore, we find the incident prompting the Marshalls' products liability claims potentially disruptive to maritime commerce under the "connection with maritime activity" prong of the *Grubart* test.

■ We now turn to the second part of the inquiry under the connection prong and ask whether the "general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Grubart,* 513 U.S. at 539, 115 S.Ct. 1043. "[T]he relevant 'activity' is defined not by the particular circumstances of the incident, but by the general conduct from which the incident arose." *Sisson,* 497 U.S. at 364, 110 S.Ct. at 2897. In *Sisson,* for example, the relevant activity was not the boat catching fire, but the storage and maintenance of the boat at the marina on navigable water. *Id.* Further, in a case involving the collision of two pleasure crafts engaged in noncommercial activity on a river (water skiing and recreational fishing), the Supreme Court defined the relevant activity as navigation of boats generally, regardless of their commercial or recreational nature. *See also Foremost Ins. Co. v. Richardson,* 457 U.S. 668, 675, 102 S.Ct. 2654, 2658, 73 L.Ed.2d 300 (1982) (identifying the "traditional concern that admiralty law holds for navigation").

In this case, the plaintiffs were clearly engaged in the quintessential maritime activity of using a waterway as a medium of transportation from one destination to another. Though the plaintiffs' voyage included a recreational element, in that the passengers were on vacation aboard a yacht, the purpose of the trip is not controlling. The voyage from Florida to the Bahamas ordinarily takes a full day and night, and the fact that plaintiffs (under other circumstances) might have enjoyed the ride does not detract from the fact that their primary purpose was to navigate from port A to port B. Indeed, the allegedly defective boat almost prevented them from doing just that; it certainly impeded their ability to navigate in a serious and potentially life-threatening fashion. If the storage and maintenance of a pleasure boat docked at a marina is substantially related to a traditional maritime activity, it is at least as likely that the navigation of a pleasure boat during actual maritime voyages between those dockings

also involves traditional maritime activity. *See Sisson,* 497 U.S. at 367, 110 S.Ct. 2892; *Lewinter v. Genmar Indus., Inc.,* 26 Cal.App.4th 1214, 1218–19, 32 Cal.Rptr.2d 305 (Cal.Ct.App.1994) (finding that maritime law governed tort claim arising out of a pleasure yacht's hull failure while at sea; merging its analysis on the two prongs of the connection test but concluding that the navigation of the pleasure boat bore a substantial relationship to traditional maritime activity). We do not regard this resolution as a close call under applicable law. Accordingly, we conclude that maritime law governs plaintiffs' products liability tort claims.

### B. Plaintiffs Have Demonstrated Sufficient Personal Injury Beyond Harm To The Yacht Itself To Withstand Summary Judgment On The Maritime Products Liability Claims

While maritime law anchors our analysis of plaintiffs' products liability claims, we are unable to conclude that the record, construed in a light most favorable to plaintiffs, requires dismissal of these claims as a matter of maritime law. Defendants argue that the record demonstrates that the Marshalls suffered only an economic loss to the yacht itself, and not any personal property damage or physical injury. Therefore, defendants contend that the Supreme Court's decision in *East River Steamship Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), which prohibits tort recovery for damages sustained to a product itself, warrants summary judgment on plaintiffs' products liability tort claims. We find that defendants' argument in this regard is a non-starter, for the record clearly demonstrates at least a material issue of fact as to the personal property damage and physical injury alleged by plaintiffs.

In *East River,* the Supreme Court explained the distinction between tort and contract principles in the context of commercial maritime products liability claims. In *East River,* charterers of supertankers brought suit against turbine manufacturers seeking damages resulting from the alleged design and manufacturing defects that caused the supertankers to malfunction on the high seas. The malfunctioning devices, turbine engines and an alleged improperly installed valve, resulted in damage to the turbines only, without causing any concomitant personal property damage or physical injury to individuals. The plaintiffs-charterers brought suit in tort against the manufacturers, originally alleging products liability claims based on strict liability and negligence, as well as breach of contract and warranty claims. Reasoning that a product injuring itself causes purely monetary harm, since "no person or other property is damaged," the Court found that the failure of a product to function properly is the essence of a warranty action, "through which a contracting party can seek to recoup the benefit of its bargain." *Id.,* 476 U.S. at 867–68, 870, 106 S.Ct. at 2300, 2302. Hence, damages to a product itself, such as loss due to repair costs, decreased value, and lost profits, flow from "expectation interests," (*see Trans States Airlines v. Pratt & Whitney Canada, Inc.,* 86 F.3d 725, 729–30 (1996)), and represent the "core concern of contract law" into which tort law ought not intrude. *Id.* Otherwise, contract law would drown in a sea of tort. *Id.* (*citing* G. Gilmore, *The Death of Contract* 87–94 (1974)). Accordingly, the Court dismissed plaintiffs' tort claims, finding that no products liability claim lies in admiralty when the only injury claimed is economic loss to the product itself. *See* RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 21, cmts. (d), (e), at 293–306 (1998).

Plaintiffs suggest that the economic loss doctrine described in *East River* applies only to commercial transactions, not to the consumer context of this case, citing *Sherman v. Johnson & Towers Baltimore, Inc.,* 760 F.Supp. 499 (D.Md.1990) (Nickerson, J.). Judge Nickerson subsequently revisited that holding, finding that "every admiralty decision of which this Court is aware reaching the question of whether the *East*

*River* rule is applicable to recreational vessels has determined that the rule should apply." *Reliance Ins. Co. v. Carver Boat Corp.*, 1997 WL 714900, at *2, 1997 A.M.C. 2522 (D.Md. May 29, 1997) (finding that second owner of a recreational yacht that caught fire could not recover from the manufacturer for any damage to the boat itself under *East River*, but finding that plaintiffs could recover in tort for any damage to personal property on board the vessel at the time of the fire) (collecting authorities); D. Nixon, *Products Liability & Pleasure Boats*, 29 J. MAR. L. & COM. 243, 244 (1998) ("The *East River* distinction between contract and tort has generally been held to apply in recreational boating cases as well."); O'Donnell, Weiss & Kaplan, *On Differences Between Blood and Red Ink: A Second Look At The Policy Arguments For The Abrogation Of the Economic Loss Rule In Consumer Litigation*, 19 Nova L.Rev. 923, 926 (1995) ("[W]e urge the courts to prohibit strict liability claims for pure economic injury, even when the potential plaintiff is not a commercial entity.").

Indeed, the vast majority of courts considering the issue have concluded that a consumer, like a commercial party, may not recover for damage to a product itself under a maritime products liability tort claim. *See Sbarbaro v. Yacht Sales Int'l, Inc.*, 1996 A.M.C. 133 (S.D.Fla.1995); *Somerset Marine, Inc. v. Forespar Prods. Corp.*, 876 F.Supp. 1114 (C.D.Cal.1994); *Lewinter v. Genmar Indus., Inc.*, 26 Cal. App.4th 1214, 32 Cal.Rptr.2d 305 (Cal.Ct. App.1994); *Stanton v. Bayliner Marine Corp.*, 123 Wash.2d 64, 866 P.2d 15 (1993), *cert. denied*, 513 U.S. 819, 115 S.Ct. 78, 130 L.Ed.2d 32 (1994); *Karshan v. Mattituck Inlet Marina & Shipyard Inc.*, 785 F.Supp. 363 (E.D.N.Y.1992); *Sisson v. Hatteras Yachts, Inc.*, No. 87 C 0652, 1991 WL 47543 (N.D.Ill. Apr.2, 1991); *but see Farley v. Magnum Marine Corp., N.V.*, 1995 A.M.C. 2800 (S.D.Fla.1995); *compare Alloway v. General Marine Indus., L.P.*, 149 N.J. 620, 695 A.2d 264, 267–75 (1997) (applying state law, not maritime law, but adopting *East River*'s holding in instances when a product injures only itself, concluding that *East River* precludes tort recovery even in consumer transactions, but finding that the law of that state generally allows plaintiffs to recover economic loss under warranty theories without privity restrictions) *with Wellcraft Marine v. Zarzour*, 577 So.2d 414, 419 (Ala.1990) (applying state law and finding no distinction between consumer and commercial buyers for purposes of foreclosing recovery in tort when a product damages only itself, and agreeing with trial court that buyer could not recover on warranty claims because no privity of contract existed between buyer and manufacturer).

We wish to emphasize that we do not perceive the Marshalls as lacking in either bargaining power or sophistication in this case. In *East River*, the Court found that since the commercial setting generally does not involve large disparities of bargaining power between parties, and since the commercial user may obtain insurance for the purchased product, tort law need not protect the user's interest in the product itself. In this case, not only did the Marshalls' secure over $40,000 worth of repairs from defendant Wellcraft (a commercial entity no less), their negotiating savvy also resulted in an $18,000 electronic upgrade that left their yacht superior to its pre-incident condition. The Marshalls also had obtained insurance on their yacht, providing another reason not to impose tort protections where the risk of loss to the product itself has been allocated in the marketplace.[6]

---

**6.** The more complicated question that the parties do not brief is whether maritime tort law allows recovery for loss to the product itself in the context of resale after initial use where two consumers, the initial user/reseller and the subsequent user/buyer (e.g. the remote buyer), engage in a transaction. Indeed, the law of contracts may apply less forcefully in some consumer transactions, as it seems less likely that a consumer user/reseller will offer the subsequent user/buyer a warranty on a used product akin to the manufacturer's initial warranty on that product. *See Saratoga Fishing Co. v. J.M. Martinac &*

A much different story unfolds, however, where an alleged defective product causes personal injury or property damage, for then, *East River* validates the application of tort principles to protect public safety. *See East River*, 476 U.S. at 866, 106 S.Ct. at 2300 (finding that tort protections apply to personal property loss since "[s]uch damage is considered so akin to personal injury that the two are treated alike") (*citing Seely v. White Motor Co.*, 63 Cal.2d 9, 19, 45 Cal.Rptr. 17, 24, 403 P.2d 145 (1965)). And herein lies the real dispute between the parties, as they disagree on whether the Marshalls sustained damage to their persons or property.

As we plot a course for resolving that issue, we must first address the natural question of what constitutes the "product itself" under the facts of this case, even though the parties did not discuss the matter. Indeed, our circuit has noted that "there is nothing obvious" about how to draw the line around a single "product." *Trans States*, 86 F.3d at 731 (applying Illinois law, not maritime law, and certifying question to Illinois Supreme Court whether an airplane's engine and its airframe were two products or one, with the Illinois Supreme Court answering that the two parts constituted a single product since the parties did not bargain separately for individual components). Fortunately, in terms of our analysis, the Supreme Court recently addressed what constituted the "product itself" under maritime law when a fishing vessel's alleged defective hydraulic system caught fire, leading to a flood that sank the ship. *Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875, 877, 117 S.Ct. 1783, 1785, 138 L.Ed.2d 76 (1997). The Court noted at the outset of its discussion that "all agree that the 'product itself' consists at least of a ship as built and outfitted by its original manufacturer and sold to an initial user." *Id.* The issue before the Court was whether destroyed equipment (a skiff, a fishing net, spare parts) that the initial purchaser added to the boat after its first sale was part of the ship itself when resold to a subsequent user. In *Saratoga Fishing*, the second owner of the ship filed an admiralty tort claim against the manufacturer of the hydraulic system and the company that built the vessel, seeking to recover for damages to the extra equipment added by the initial purchaser. The Court determined that the skiff, fishing net and other equipment constituted "other property" for which the plaintiff could recover under a tort theory since those items were not part of the ship itself:

> When a Manufacturer places an item in the stream of commerce by selling it to an Initial User, that item is the "product itself" under *East River*. Items added to the product by the Initial User are therefore "other property," and the Initial User's sale of the product to a Sub-

---

Co., 520 U.S. 875, 882–83, 117 S.Ct. 1783, 1787–88, 138 L.Ed.2d 76 (1997). Also, since the downstream consumer purchaser is at least one step removed from the manufacturer or distributor, it is less probable that he/she would negotiate directly with a manufacturer for a warranty (putting aside the requirements of the Uniform Commercial Code for the moment).

Yet, where a product only harms itself, the public safety concerns animating tort law subside. Moreover, consumers are not prevented from factoring the existence or absence of warranty into a product's purchase price. Ostensibly, a subsequent user/buyer who purchases a used boat from another consumer without a manufacturer's warranty receives a lower price in return. Rational consumers.in that position, especially those purchasing ex-

pensive luxury yachts, may invoke the protections of insurance as they see fit, an option that may be preferable to importing tort law (and allocating risk of loss to the manufacturer in the process) to protect downstream consumers against economic loss incurred from injury to the product alone. Of course, if the defective product injured more than just itself, tort protections would engage irrespective of whether the manufacturer or initial user/reseller negotiated a warranty with a subsequent user/buyer for the value of the product itself. In the end, the parties to this litigation have not developed any of these issues, so based upon the Marshalls' demonstrated sophistication and for purposes of this particular case only, we will follow the vast majority of courts that apply *East River* to both consumer and commercial transactions.

sequent User does not change these characterizations.

*Saratoga Fishing,* 520 U.S. at 879, 117 S.Ct. at 1786.

■ In this case, the Marshalls have consistently alleged that the portlight incident damaged personal property, even requesting that defendants compensate them for those alleged losses. Defendants have never claimed that any of this personal property was part of the ship itself when Wellcraft initially sold it to the first purchaser. Rather, they contend that no evidence demonstrates that any property damage or physical injury even occurred and that, in any event, any personal loss was *de minimis. See* Defs.' Reply at 5–6. We find defendants' position unavailing, as the record as summarized below, with all reasonable inferences taken from it in the Marshalls' favor, demonstrates injury to the Marshalls' personal property.

William Marshall testified that flooding caused by the allegedly defective yacht caused personal property damage, an assertion supported both by Marshall's personal knowledge and by common sense. In fact, the Marshalls sent Wellcraft a detailed, itemized list of damaged or lost personal property, which included replacement/repair values. Some of the alleged lost or damaged items include a TV/VCR ($400), a cordless drill ($225), customized towels, canvas, and pillows ($675), various electronic devices, tools, parts, photographs, food, supplies and clothing. William Marshall references this list in his declaration, contending that Wellcraft actually requested that he prepare it and that Wellcraft agreed to compensate him for some of those items. The defendants acknowledge the Marshalls' requests for reimbursement for personal property (although they claim that they have persistently refused to compensate the Marshalls for that property) and they actually include the Marshalls' September 5, 1997, letter as designated evidence in support of their statement of material facts. *See* Def. St. Facts ¶¶ 1, 5, 6; Guess Decl. ¶ 6 (Ex. A, Letter from William Marshall to James Guess). The alleged damage to these items, which strike us as analogous to the skiff and fishing net at issue in *Saratoga Fishing,* constitutes sufficient record evidence to withstand dismissal of the Marshalls' maritime products liability claims as a matter of law. While defendants simply discount the alleged damage to these items as *de minimis,* we find that injury to this "other property" is compensable under a maritime tort theory, in accord with *Saratoga Fishing.*[7]

Moreover, in addition to personal property loss, William Marshall testified that he sustained physical injury from electrical shocks while attempting to prevent JUST ENOUGH from sinking. *See* W. Marshall Decl. ¶ 6. Defendants claim that this alleged injury qualified as "transitory sensations at most, resulting in no appreciable physical harm." Defs.' Reply at 6. We are not prepared to conclude that what William Marshall experienced was nothing,

---

7. Of course, the evidence adduced at trial may affect whether the Marshalls can recover for the items listed in William Marshall's letter (or other items not identified), but these items provide a sufficient basis for our conclusion that the portlight incident damaged more than the ship itself. For instance, we suspect that damage to some of the items listed, such as the engine compartment or the galley, constitutes injury to component parts of the craft as sold by Wellcraft sold to the initial purchaser, unlike other items, such as personal photographs, that clearly constituted separate personal property not included by the manufacturer. That said, plaintiffs alleged personal property loss totaling in the thousands of dollars, an amount we do not regard as *de minimis* on its face. *Cf. Veeder v. NC Machinery Co.,* 720 F.Supp. 847, 853 (W.D.Wash.1989) (noting that oil spray on cleanable surfaces and a rug was *de minimis* "other property damage"). And while this amount may not be overwhelming compared to the total value of the boat (neither party provides us with that figure or the Marshalls' purchase price) or in light of the amount defendants have already reimbursed the Marshalls compared to their losses, the value of the skiff, fishing net, and spare parts in *Saratoga Fishing* also was likely just a portion of the value of the tuna vessel at issue in that case.

and perhaps defendants would even contend differently if their own agents had experienced the electrical shocks incurred by Mr. Marshall. Obviously, William Marshall was not electrocuted and in fact he did not require hospitalization. Nonetheless, we are not prepared to characterize electrical shocks as the type of physical harm that eludes tort recovery. Ultimately, a jury must make the determination as to the degree of physical injury experienced by William Marshall and the amount of damages, if any, to compensate him for the (perhaps painful) physical experience associated with the alleged electrical shocks. *See* RESTATEMENT (SECOND) OF TORTS § 905, cmt. (b) & Illustrations, at 456–57 (1979) ("Bodily harm is any impairment of the physical condition of the body, including illness or physical pain.... damages can be awarded although there is not impairment of a bodily function, and in some situations, even though the defendant's action is beneficial."). Accordingly, we shall not hold as a matter of law that the portlight incident caused only economic damage to the yacht itself. Defendants' motion for summary judgment on the Marshalls' products liability tort claims for any damages arising from personal property loss and bodily injury is *DENIED*.

## II. Breach of Contract and Warranty Claims

Plaintiffs' original complaint included claims that the defendants breached a number of express and implied contracts and warranties pertaining to the construction, condition and repair of their yacht, JUST ENOUGH. Defendants move for dismissal of all these claims, with plaintiffs abandoning most of them on summary judgment and barely mustering any defense of the claims they do address. We conclude that plaintiffs' contract and warranty claims fail for a multitude of reasons, not the least of which is plaintiffs' complete failure to develop the legal or factual bases for these contentions.

Defendants assert, and plaintiffs fail to dispute, that Florida law governs the Marshalls' breach of contract and warranty claims. Because these claims relate to alleged contracts and warranties regarding the construction and repair of the Marshalls' yacht, they fall within the province of state law and outside our admiralty jurisdiction.[8] *See East River*, 476 U.S. at 872 n. 7, 106 S.Ct. at 2303 n. 7 ("If the charterers claims were brought as breach-of-warranty actions, they would not be within the admiralty jurisdiction.... [s]tate law would govern the actions.") (citations omitted); *Statia Terminals N.V. v. Huber Inc.*, No. Civ. A. 95–1633, 1997 WL 73558, at *2 (E.D.La. Feb.20, 1997).

As a federal court sitting in diversity to resolve these remaining claims, we look first to Indiana's choice-of-law rules to determine the substantive law applicable to resolving questions of contract. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Stinnett v. Northwestern Mut. Life Ins. Co.*, 58 F.Supp.2d 1000, 1002 (S.D.Ind. 1999). Indiana's choice of law rule for contract actions "calls for applying the law of the forum with the most intimate contacts to the facts." *See Employers Ins. of Wausau v. Recticel Foam Corp.*, 716 N.E.2d 1015, 1024 (Ind.Ct.App.1999); *W.H. Barber Co. v. Hughes*, 223 Ind. 570, 63 N.E.2d 417, 423 (1945). That approach requires consideration of "all acts of the parties touching the transaction," which includes assessing the places of contracting, negotiation, and performance, the location of the subject matter of the contract, and the domicile, residence, and places of incorporation and business of the parties. *Travelers Indem. Co. v. Summit Corp. of America*, 715 N.E.2d 926, 931 (Ind.App.1999).

The Marshalls do not address the choice of law question nor do they dispute

---

8. For purposes of clarity, we note that plaintiffs assert the breach of contract and warranty claims against the manufacturers of the yacht and the portlights, and not against Rybovich, the boat yard that actually performed the repairs after the portlight incident.

that Florida law governs the contract and warranty claims. Based upon the factors identified above, we agree with defendants that Florida has the most intimate contacts to this action. The Marshalls purchased the yacht in Florida, so any alleged contracts or warranties arising from that transaction originated in that state. Based on the limited record before us, the primary negotiation for any repairs, as well as any "performance," also occurred in Florida. After the portlight incident, the Marshalls retained two Florida-based surveyors to assess the damage to the yacht, which the surveyors accomplished at a Florida location. Based on those reports, the Marshalls requested that defendant Wellcraft hire a Florida-based service yard to effect the repairs in Florida. Also, defendant Wellcraft directed its correspondence regarding negotiated repairs to the Marshalls' Florida address. *See* Guess Decl. (Ex. A). Of course, the yacht, the subject of any alleged contract or warranties, sailed out of a Florida port prior to the incident in question, returned to a Florida port after the incident, and remained in Florida during the course of repairs. The one fact favoring the application of Indiana law, the Marshalls' Indiana residency, is offset by Wellcraft's business location in Florida, not to mention the apparent other significant contacts the Marshalls have to Florida. Overall, we conclude, based upon the balance of factors, that Florida has the most intimate contacts to the facts of this case.

Having determined that Florida law governs any remaining breach of contract or warranty claims, we are left to identify the claims plaintiffs have not relinquished

from a review of their reply to defendants' motion for summary judgment. A generous reading of plaintiffs' reply indicates that they claim: (1) that defendants breached an express warranty under the Uniform Commercial Code by publishing advertisements representing that Wellcraft built the yacht in question to give "years of hassle-free bluewater cruising," and (2) that defendants breached an express or implied contract to repair the yacht "in a prompt manner." Pls.' Reply at 8. Plaintiffs do not make mention of any of the other contract or implied warranty theories alleged in the original compliant, such as the implied warranty of merchantability or the implied warranty of fitness for a particular purpose, nor do they offer any factual or legal support for these putative claims.

Defendants rejoin that any express or implied warranty claims fail as matter of law because the Marshalls are not in privity with the defendants. They also claim that the express warranty claim based on the advertisements fails because the advertisements qualify as Wellcraft's statement of opinion about the yacht and not as an express warranty. In regard to the alleged contract for prompt repair of the boat, defendants contend that they never reached any agreement or contract and that, in any event, no evidence suggests that defendants breached the contract. We conclude that plaintiffs' breach of contract and warranty claims require dismissal as a matter of law, as they lack integrity on a titanic scale.

■■■ First, it is undisputed that no privity of contract exists between the Marshalls and the defendants.[9] The Marshalls

---

**9.** For a discussion of privity and various judicial formulations of the doctrine in the context of warranty claims under the U.C.C., *see* W. Stallworth, *An Analysis of Warranty Claims Instituted by Non–Privity Plaintiffs In Jurisdictions That Have Adopted Uniform Commercial Code Section 2–318 (Alternative A)*, 20 Pepp. L.Rev. 1215 (1993); W. Stallworth, *An Analysis of Warranty Claims Instituted by Non–Privity Plaintiffs In Jurisdictions That Have Adopted Uniform Commercial Code Section 2–318 (Alternatives B & C)*, 27 Akron

L.Rev. 197 (1993); Hawkland Uniform Commercial Code Series § 2–318:1, 2–318:2 (noting that Alternative A states, such as Florida and Indiana, recognize that the Code assumes a neutral position on vertical privity requirements, leaving development of the doctrine to state common law); U.C.C. § 2–313 official cmt. 2; White & Summers, *Uniform Commercial Code* (Vol.1) § 10–5, § 11 (4th ed.1995). We further note that the parties have not considered the interrelation of the economic

fail to respond in their reply to defendants' argument, which constitutes an admission that no genuine issue of material fact exists on the privity issue. *See Nabozny v. Podlesny*, 92 F.3d 446, 457 n. 9 (7th Cir. 1996); *Glass v. Dachel*, 2 F.3d 733, 739 (7th Cir.1993). "The law of Florida is that to recover for the breach of a warranty, either express or implied, the plaintiff must be in privity of contract with the defendant." *T.W.M. v. American Med. Sys., Inc.*, 886 F.Supp. 842, 844 (N.D.Fla. 1995) (*citing Kramer v. Piper Aircraft Corp.*, 520 So.2d 37 (Fla.1988) & *Intergraph Corp. v. Stearman*, 555 So.2d 1282, 1283 (Fla.Dist.Ct.App.1990)); *Elizabeth N. v. Riverside Group, Inc.*, 585 So.2d 376, 378 (Fla.Dist.Ct.App.1991) ("A warranty, whether express or implied, is fundamentally a contract. A contract cause of action requires privity.") (*quoting Navajo Circle, Inc. v. Development Concepts Corp.*, 373 So.2d 689, 692 (Fla.Dist.Ct.App.1979)); *Hernandez v. Coopervision, Inc.*, 691 So.2d 639, 641 (Fla.Dist.Ct.App.1997) (dismissing claims for implied warranties of merchantability and fitness for purpose due to lack of privity). A plaintiff who purchases a product, but does not buy it from the defendant, is not in privity with that defendant. *T.W.M.*, 886 F.Supp. at 844 (*citing* White & Summers, *Uniform Commercial Code* § 11–2, at 528 (3rd ed.1988)); *see Barrow v. Bristol–Myers Squibb Co.*, No. 96–689–CIV–ORL–19B, 1998 WL 812318, at *46 (M.D.Fla. Oct.29, 1998).

Wellcraft's express, limited warranty extended only to the "first retail purchaser" of the yacht, and it is undisputed that plaintiffs were not the first retail purchasers and that they did not purchase the yacht from the defendants. Plaintiffs purchased the boat from an unidentified Florida seller, and we have no information pertaining to any negotiations or representations that may have occurred between the parties in that transaction. In any event, the undisputed lack of privity between plaintiffs and defendants alone strikes a fatal blow to plaintiffs' express or implied warranty claims in this case. Accordingly, we *GRANT* defendants' motion for summary judgment as to those claims.[10]

■ Next, plaintiffs claim that they "contracted with Wellcraft for the boat to be repaired in a prompt manner." Pls.'

---

loss doctrine and privity requirements in commercial or consumer transactions, so we refrain from any further elaboration on the subject in the case at bar.

10. We also find some merit in defendants' argument that the general statements in their advertisements qualify simply as Wellcraft's opinion concerning the quality of the boat and not as a warranty, thereby providing an independent basis to dismiss the express warranty claim. *See, e.g.,* U.C.C. § 2–313 ("an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty"); *Bayliner Marine Corp. v. Crow*, 257 Va. 121, 509 S.E.2d 499 (1999). In fact, plaintiffs never offer any evidence, either through affidavit or deposition, that the advertisements served as a "basis of the bargain" or that they knew about or otherwise relied upon the advertisements when purchasing their yacht or, for that matter, at any time prior to initiating this litigation. *See* Hawkland UCC Series § 2–313:3 (observing that the tendency under the Code is that advertisements may create express warranties if the buyer relies on them); White & Summers, *Uniform Commercial Code* (Vol.1) § 9–5, at 195 (4th ed.1995). Additionally, we note generally (aside from the privity issue) that plaintiffs fail to analyze the elements of a warranty claim, identify or address the specifics of any one warranty theory, or cite any provision of either the Uniform Commercial Code or the Florida Code. *See Liberles v. Cook County*, 709 F.2d 1122, 1126 (7th Cir.1983) ("It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered."); U.C.C. § 2–313 (express warranties), § 2–314 (implied warranty of merchantability), § 2–315 (implied warranty of fitness for a particular purpose); Ch. 672, Fla.Stat.; *In re Masonite Corp. Hardboard Siding Prods. Liab. Litig.*, 21 F.Supp.2d 593, 599–600 (E.D.La.1998) (discussing elements of warranty claims under Florida law); *Czarnecki v. Roller*, 726 F.Supp. 832, 842–44 (S.D.Fla.1989) (dismissing claims for implied warranties of merchantability and fitness for a particular purpose and explaining claims under Florida law).

Reply at 8. Yet, plaintiffs fail to adduce admissible evidence that defendants made any representations whatsoever about the length of time to complete the agreed-upon repairs to JUST ENOUGH. *See supra* note 4. In his declaration, William Marshall testified that he and his wife "were informed that the repairs" would take one or two months to complete, but he never identifies the source of that alleged information, when the alleged conversation occurred, or to what repairs the alleged source referred. W. Marshall Decl. ¶ 19. Of course, defendants' claim in their (undisputed) material facts that they never made any offers pertaining to a prompt repair of the Marshall's yacht. We simply find no evidence in the record to demonstrate that defendants made any such offer or that the parties reached a meeting of the minds on the length of time necessary to conduct repairs of JUST ENOUGH. *See Holloway v. Gutman,* 707 So.2d 356, 357 (Fla.Dist.Ct.App.1998) (recognizing that mutual assent is an absolute condition precedent to contractual formation).

■ Moreover, any putative offer and acceptance between the parties lack the consideration necessary for contract formation. *See Johnson Enter. of Jacksonville, Inc. v. FPL Group, Inc.,* 162 F.3d 1290, 1311 (11th Cir.1998) ("It is a fundamental principle of contract law that a promise is not enforceable unless it is supported by consideration."); RESTATEMENT (SECOND) OF CONTRACTS § 17 ("[T]he formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration."). While plaintiffs claim that they declined to pursue an insurance claim "in consideration for this agreement" for prompt repair of the yacht (*see* Pls' Reply at 8), plaintiffs provide no evidence that the parties bargained for plaintiffs' alleged forbearance or, for that matter, that defendants ever knew that plaintiffs had secured an insurance policy on the yacht or that plaintiffs actually did fail to pursue a claim. William Marshall does not even testify in his declaration that he informed the defendants that the policy existed or that he intended to forego pursuing an insurance claim in consideration for promptness in repair of the boat.[11] Accordingly, we find essential elements for contract formation missing from the alleged contract and *GRANT* defendants' motion for summary judgment on that claim.[12]

### Conclusion

For the reasons discussed above, defendants' motion for summary judgment on plaintiffs' maritime products liability tort claims is *DENIED.* Defendants' motion for summary judgment on plaintiffs' state

---

11. We have acknowledged that the parties disagree on whether defendants offered to compensate plaintiffs for personal property loss, but plaintiffs never claim in their reply that the parties entered some type of express or implied contract for compensation for personal property loss. Even if plaintiffs had alleged the existence of a contract for reimbursement for personal property loss, it, like the alleged contract for promptness in conducting repairs of the boat, would fail for want of consideration (plaintiffs never identify any other form of consideration aside from the alleged forbearance on the insurance claim). Also, plaintiffs have not mentioned promissory estoppel, never mind advanced the theory, so we express no opinion on any such claim.

12. A practical problem regarding compensable damages also confronts plaintiffs' breach of contract and warranty claims, which are based on expectation damages. Expectation damages under the warranty claims, for instance, would give plaintiffs the full benefit of their alleged bargain by placing them in the position they would have been in had the portlights functioned properly. *See East River,* 476 U.S. at 873–74, 106 S.Ct. 2295. Such damages would include repair costs and consequential damages flowing from lack of use of the boat. *Id.* Yet, defendants already have completed over $40,000 worth of repairs to JUST ENOUGH according to the specifications provided by marine surveyors, whom the plaintiffs hired to assess the damage to the boat caused by the portlight incident. Also, defendants added over $18,000 worth of upgrades to JUST ENOUGH, an amount that at least partially compensates plaintiffs for any other damages flowing from lost use of their yacht.

law breach of contract and warranty claims is
*GRANTED.*